FERDINAND H. PECORA ET AL. *v.* ZONING COMMISSION OF THE TOWN OF TRUMBULL ET AL.

DALY, C. J., BALDWIN, KING, MURPHY and MELLITZ, Js.

Argued May 6—decided July 17, 1958

*John T. Fitzpatrick,* for the appellants (plaintiffs).

*Frederick F. Ehrsam,* with whom was *Nicholas T. Giangrasso,* for the appellees (defendants Frouge).

*Aaron A. Levine,* for the appellee (named defendant).

KING, J. This is an appeal from the action of the zoning commission of Trumbull in changing a tract of about sixty acres from a residence A to a commercial B-C zone, thereby authorizing its use for a regional shopping center. Zoning in Trumbull exists under the provisions of chapter 43 of the General Statutes as amended. Trumbull Zoning Regs., p. 1 (1953).

In August, 1955, pursuant to the recommenda-

tions of a group of professional planning experts retained by the town for the purpose, a master plan of development for the entire town was adopted by it. Whether this master plan was ever actually adopted as a comprehensive plan by the zoning commission does not clearly appear from the finding. See *Levinsky* v. *Zoning Commission*, 144 Conn. 117, 122, 127 A.2d 822. The zone changes necessary to put it into effect, at least in the area involved in this appeal, had not been made. However, as we view the case the result is not changed if it is assumed that the master plan was in fact a comprehensive plan, and it will hereinafter be referred to as such. This plan recommended that the sixty-acre tract in question, with the exception of a small strip along Ox Brook hereinafter to be noted, be rezoned from residence to large scale business and light industry. The plan provided for small shopping centers, embracing an aggregate of thirty acres, at four other locations in the town. The sixty-acre tract is about midway between Main Street and Madison Avenue, its most easterly boundary being about 1200 feet west of Main Street and its most westerly boundary about 1100 feet east of Madison Avenue. Its northerly boundary is the Merritt Parkway and its southerly and westerly boundaries are Ox Brook.

Prior to October 3, 1955, Thomas, John and Jack Frouge, hereinafter referred to as the Frouges, who, with the zoning commission, are defendants in this appeal, filed a petition for a zone change of the sixty acres. They owned the entire tract and also additional contiguous land. On October 3, the commission informally discussed the petition at an executive session and decided to ask the Frouges to appear and explain it more fully, "particularly with

the thought of land use, residences, etc." The next day, one of the Frouges appeared and explained their petition in more detail. They at that time had in mind a regional shopping center of about forty-three acres. At an executive session on January 10, 1956, the Frouges presented a drawing of the proposed shopping center and were then requested to present a formal petition giving more specific information. This was done, and the petition was considered at an executive session on January 31, 1956. It was decided that the commission would view the premises the following Sunday morning. At an executive session on February 7, 1956, the commission decided that a green belt, supplemented, where necessary, by plantings so as to be of a minimum width of fifty feet, should surround the area and that the public hearing should be held during the week of February 26. The public hearing was held on February 28, and there was considerable opposition, but at an executive session on March 1 the zone change was adopted effective March 10, 1956. It is from this action that the present appeal is taken.

While the minutes of the executive sessions and of the public hearing were quite full, there was no stenographic transcription or mechanical recording of the public hearing. Consequently, the court admitted evidence on this appeal and, with counsel, itself viewed the premises. General Statutes, Cum. Sup. 1955, §§ 379d, 381d; Nov. 1955 Sup., § N11; *Village Builders, Inc.* v. *Town Plan & Zoning Commission,* 145 Conn. 218, 221, 140 A.2d 477. The plaintiffs in oral argument abandoned their attempts to secure additions to the finding.

One of the plaintiffs' claims is that there would be an increase in traffic in a large regional shopping center as distinguished from the four small shop-

ping centers proposed in the comprehensive plan, and that therefore there is a violation of § N10 of the November, 1955, Supplement, providing that the regulations of a zoning commission shall, inter alia, "be made in accordance with a comprehensive plan and . . . be designed to lessen congestion in the streets." The comprehensive plan recommended large scale business and light industrial uses in the area in question. The rezoning as actually adopted authorized a higher and more restricted use. There is nothing to indicate that a regional shopping center, where traffic might be expected to be fairly constant throughout the day, would create more "congestion in the streets" than would factories which might spring up in a light industrial zone, since operatives in factories would go to and from work almost en masse at substantially the same hours. It is not the over-all volume of daily traffic, but "congestion in the streets," that is, density of traffic, which is referred to in the statute. See *Service Realty Corporation* v. *Planning & Zoning Board of Appeals*, 141 Conn. 632, 638, 109 A.2d 256. Furthermore, literally, under the claim of the plaintiffs as to traffic, a residence area could seldom, if ever, be changed to a business or industrial use, regardless of the recommendations in a comprehensive plan, since almost necessarily there would be a resultant increase in street traffic in the immediate area. The over-all actions of the zoning commission must conform to the mandates of the statute. But these do not apply to every detail of the commission's actions. The construction claimed by the plaintiffs would render the statute unworkable. An intent to enact an unworkable statute is not to be imputed to the General Assembly unless the statutory language expressly requires it. *Bridge-*

*port* v. *Stratford,* 142 Conn. 634, 644, 116 A.2d 508.

Another claim of the plaintiffs is that the commission attached to the land in question certain special and additional requirements, not applicable in other commercial B-C zones in Trumbull, thereby violating the portion of § N10 providing that "[a]ll . . . regulations shall be uniform for each class or kind of buildings or structures throughout each district, but the regulations in one district may differ from those in another district." The additional requirements here included the green belt of a minimum width of 50 feet, that no building be within 150 feet of the westerly boundary, which is Ox Brook, and that there be strict compliance with the drainage requirements of the town engineer. This last requirement was obviously motivated by the fact that the southern portion of the area is marshy. There is nothing to indicate that these additional requirements in any way injured the plaintiffs or that they were aggrieved by them. See *Mills* v. *Town Plan & Zoning Commission,* 145 Conn. 237, 240, 140 A.2d 871. If anyone was entitled to complain, it would be the Frouges. That aside, the regulations which under the statute are required to be uniform are those affecting "buildings or structures," while the requirements imposed here affected the land itself. The requirement as to the 150-foot building line really affected the land use rather than any building or structure.

The plaintiffs make a further claim that these requirements were beyond the power of the commission to establish under the zoning ordinance of Trumbull because they fell within the exclusive jurisdiction of the zoning board of appeals. Trumbull Zoning Regs., art. 6, § 1(c) (1953). If we assume that the provision referred to gives to the board of

appeals the power to make such requirements as are involved here, there is nothing to show that the grant of power is exclusive with that body. The plaintiffs also claim that the requirements are unenforceable. As far as enforcement is concerned, the rezoning of the property does not, ipso facto, authorize its use. A building cannot be erected without a building permit; id., art. 5, § 2(a); nor be occupied without a certificate of occupancy. Id., art. 5, § 3(a). Appeals from the refusal to grant a building permit are taken to the board of appeals. Id., art. 6, § 1(a). This board is also granted the usual limited power to authorize variances and grant exceptions. Id., art. 6, §§ 1(b), (c), (d). We cannot find that there is any inability on the part of the zoning officials to enforce compliance with the requirements in question.

Nor do we find any merit in the claim of "spot zoning." The comprehensive plan had already recommended a change of zone in substantially the area involved. The change as adopted was to a use higher than that recommended and was otherwise in harmony with the comprehensive plan. The adoption of a comprehensive plan does not require exact compliance on the part of the zoning commission with every detail of the plan, nor have we ever so held. What is required is that the zoning regulations be in harmony with the comprehensive plan. *Guerriero* v. *Galasso,* 144 Conn. 600, 607, 136 A.2d 497. As the trial court pointed out, the substitution of Ox Brook for the slightly different artificial boundary suggested in the comprehensive plan was an obvious improvement. The commission stated on its record four reasons for its action in rezoning. These were: (1) The zone change was in substantial conformity with the comprehensive plan; (2) it provided a

necessary facility (shopping center) for the general welfare of the town; (3) it was the most appropriate use of the land; (4) the area as rezoned has natural boundaries. These reasons fully supported the commission's action within the requirements of § 375d of the 1955 Cumulative Supplement (now Public Acts 1957, No. 662). We cannot find that the court was in error in concluding, in effect, (1) that the plaintiffs had failed to prove that the commission had acted otherwise than logically, reasonably and legally, and (2) that, consequently, the court legally could not substitute its own discretion for the wide and liberal discretion enjoyed by zoning agencies. *Guerriero* v. *Galasso,* supra.

The commission, in granting the change of zone, provided for the unlimited parking of motor vehicles within a 750-foot radius of the rezoned area. This provision the court held invalid, and the defendants took no appeal from the decision. Therefore we do not review the ruling but assume its correctness in considering the plaintiffs' claim that the court erred in holding the provision as to parking severable from the actual change of zone. The Court of Common Pleas, in an appeal such as this, may "reverse or affirm, wholly or partly, or may modify or revise the decision appealed from." Cum. Sup. 1955, §§ 379d, 381d; Nov. 1955 Sup., § N11. Without attempting to define the full measure of revisory powers granted the court by this statute, we point out that it clearly authorized the court to strike down so much of the action of the commission as permitted unlimited parking outside the rezoned area. The effect of this decision of the court was to reduce the parking area by about 20 per cent. The plaintiffs claim that when the provision as to parking was stricken, the change of zone had to fall

with it. It was clearly severable, and we find nothing in *Gunther* v. *Board of Zoning Appeals,* 136 Conn. 303, 71 A.2d 91, or *Bartram* v. *Zoning Commission,* 136 Conn. 89, 68 A.2d 308, the two cases relied upon by the plaintiffs, which supports their claim.

The final claim of the plaintiffs is that the action of the commission in considering the Frouges' proposals in executive session before presenting them to the public hearing in effect amounted to final approval by the commission prior to the hearing and thus reduced the hearing to an impotent formality. Of course, if it was true that the commission had actually made up its mind, in advance of the public hearing, that it was going to approve the proposed regulations regardless of any changes or arguments in opposition which might be urged at the hearing, the final action of the commission in changing the zone would be clearly illegal, since the whole purpose of the public hearing would have been thwarted. *Couch* v. *Zoning Commission,* 141 Conn. 349, 357, 106 A.2d 173. To discover the truth of the matter, the state of mind of the commission had to be determined as a question of fact. *State* v. *Nathan,* 138 Conn. 485, 488, 86 A.2d 322. As in other situations where a state of mind is to be proved, circumstantial evidence was appropriate. *Hennessey* v. *Hennessey,* 145 Conn. 211, 214, 140 A.2d 473. The burden of proving the illegality of the commission's action was on the plaintiffs. The question is not whether there was evidence, circumstantial or otherwise, from which the court could have found that the commission, in advance of the public hearing, had made up its mind. The question is whether the court's refusal so to find was erroneous as a matter of law, or, conversely stated,

whether the court was compelled as a matter of law so to find on the evidence before it, including the record of the proceedings of the commission. The plaintiffs place great reliance on the phraseology occurring in the minutes of certain of the executive sessions. Examples of this language may be found in the minutes of the executive session of January 31, 1956, which state: "The green belt buffer area on the South would have to be 50 feet and a building would have to be 150 feet from the edge of the brook on the southern boundary." Similar language occurs in the minutes of the executive session of February 7, 1956.

In connection with a similar claim made in the *Couch* case, supra, 358, we said: "The phraseology of the minutes might be stretched to support that claim. It must be borne in mind, however, that we are dealing with a group of laymen who may not always express themselves with the nicety of a Philadelphia lawyer. Courts must be scrupulous not to hamper the legitimate activities of civic administrative boards by indulging in a microscopic search for technical infirmities in their actions." Had the present change of zone been proposed by the commission itself, as in the *Couch* case, supra, it would have been the clear duty of the commission tentatively to determine whether there should be a change and, if so, what it should be, and, thereafter, to hold a public hearing on the proposed regulation or boundary after a proper notice, including a copy of the proposed change. Cum. Sup. 1955, § 375d; *Couch v. Zoning Commission,* supra. There is no valid ground for distinction, as far as the factual question of an open mind at the public hearing is concerned, between a tentative approval by the commission, in advance of the public hearing, of a zoning change

emanating from itself and a tentative approval of one emanating from a private landowner. Especially is this true here, where there is no claim, and no basis for any claim, of morally or ethically questionable conduct on the part of the members of the commission or anyone else, in contrast to the situation, for example, in *Mills* v. *Town Plan & Zoning Commission,* 144 Conn. 493, 495, 134 A.2d 250.

It is true that it was held, at least inferentially, in the *Couch* case, supra, 357, that where, as here, a resident landowner presents to a zoning commission a petition for a zone change for an additional business area, the commission is entitled to require of him a petition specifically setting forth his proposed change, to submit that petition, unchanged, to a public hearing and to remain aloof from any consideration of the merits of the petition until after the hearing. If the commission pursues such a course, it will normally obviate any possibility of a claim, such as the one here, that it made up its mind in advance. But there is nothing in the opinion in the *Couch* case, supra, which holds that if the commission fails to follow such a course it has demonstrated that it acted illegally in that it had made up its mind finally in advance of the public hearing. Whether the commission conducted the public hearing with the open mind required by the law is still a question of fact.

Here, the Frouges had indicated to the commission at the preliminary conference a willingness to accept its suggestions as to certain broad details of the proposed shopping center. The minutes show that the commission called in the town engineer on the drainage questions and that an expert planner employed by certain residents in the area also attended these executive sessions and made suggestions, some of which, notably those with respect to

the green belt, were incorporated in the proposed regulation as submitted to the public hearing. In the minutes of the executive session of January 31, 1956, it is stated: "The parking areas affected will also have to be provided for in the call." All this could be, as in effect it was, found by the court to indicate that the commission was endeavoring, by consultations with the petitioners and other interested persons and with experts in the field, to safeguard the townspeople by attempting to procure, for submission to the public hearing, what the commission itself then believed to be the best possible regulation for rezoning the area, if such a regulation was to be adopted at all, instead of merely submitting whatever plan or proposed regulation the Frouges themselves saw fit to put forward. The minutes of the executive sessions support the court's finding that careful consideration was given by the commission to the complex and detailed factors involved in the change of zone as proposed. The course here pursued was entirely consistent with a public hearing at which the minds of the members of the commission remained fully open to persuasion. The fact that the holdings of the Frouges included the entire sixty-acre tract and that they appeared before the commission in person at several of the executive sessions and discussed details of the proposed zone change with the commission required and received careful consideration and scrutiny by the court. It cannot be said that the court was compelled to find that the commission had finally made up its mind, in advance of the public hearing, to approve the zone change as proposed.

There is no error.

In this opinion BALDWIN, MURPHY and MELLITZ, Js., concurred.

DALY, C. J. (dissenting). For the following reasons I am unable to agree with the majority. As found by the trial court, the town retained the services of professional planners to prepare a plan of development and in August, 1955, adopted the plan proposed by them. The total land area recommended in the plan for four small shopping centers was thirty acres. The minutes of the meetings of the zoning commission held prior to the public hearing disclose the following facts: At a meeting on October 3, 1955, a petition and map for a change of zone from residence A to light industry and business was discussed, and it was "the consensus of the [commission] to have Mr. [Jack] Frouge appear and explain the area more fully, particularly with the thought of land use, residences, etc." At a meeting on October 4, 1955, Frouge appeared. He presented a plot plan of forty-three acres. He stated that he "would like the area a Regional Shopping Center rather than a Neighborhood, or Residence X type." At a meeting on January 10, 1956, Thomas Frouge and Henry Marquardt presented a drawing of the proposed "Shopping Park" and discussed the entrances, esplanade, lighting, traffic, buildings and tunnels at length. Thomas Frouge "was asked to present a formal petition giving boundaries, buffered areas, building (character of) and a plot plan." At a meeting on January 31, 1956, Frederick Ehrsam presented for Thomas Frouge a "petition for a change of zone (in the area described)." Ehrsam said that "any changes or suggestions by the Board or Engineer would be acceptable to Mr. Frouge." At that meeting the commission decided that "[t]he parking areas affected will also have to be provided for in the call"; that "[t]he green belt buffer area on the South would have to be 50 feet and a

building would have to be 150 feet from the edge of the brook on the southern boundary"; and that "[o]n the Northern boundary a buffer might not be necessary as the Board felt that the Parkway itself is a Buffer." The commission "decided to meet on Sunday morning at 10 o'clock together with the Town Engineer to go over the property." At another meeting held on February 7, 1956, the first item on the agenda was the Frouge petition. The boundaries, parking areas and amendments were discussed at length. The commission "decided that the Green Belt be maintained and supplemented whenever necessary by plantings." It was also decided that "the Green Belt would not be less than 50 feet." There was discussion of drainage and water. It was decided "to hold the hearing during the week of the 26th of February." At the public hearing many residents of the neighborhood stated their objections.

This was the Frouges' petition for a large regional shopping center. The public hearing was had merely to comply with a statutory requirement. What the commission did after the public hearing was not an "ultimate decision" on a tentative form of the Frouges' proposals. All of the conditions were agreed to by the commission before the public hearing. The change was not in accordance with the comprehensive plan adopted in August, 1955. Compliance with the statutory procedure is a prerequisite to any valid change in zonal boundaries. The commission was required to hold a public hearing. *Couch* v. *Zoning Commission*, 141 Conn. 349, 356, 106 A.2d 173. The ultimate decision to grant the petition had to await the hearing, at which the public were privileged to express themselves. **Id.** 357. The holding of the many meetings, with rep-

resentatives of the petitioners present at the invitation of the commission, is clearly shown by the minutes to have been for the purpose of agreeing upon conditions upon which the petition would be granted. As these conditions were incorporated in the favorable action taken by the commission on March 1, 1956, the conduct of the commission is open to criticism. *Mills* v. *Town Plan & Zoning Commission,* 145 Conn. 237, 241, 140 A.2d 871. "The modification of zoning regulations partakes of the nature of a legislative proceeding; nevertheless, it is not legislative in the broad sense; on the contrary, the power emanates from a specific grant and the manner of its exercise is limited. The mode of exercising the power thus expressly granted must be reasonable. The exercise of power of that nature, whether it be denominated legislative or quasi-judicial, should command the highest public confidence, since zoning restrictions limit a person's free use of his real estate in the interest of the general public good. Anything which tends to weaken public confidence and to undermine the sense of security of individual rights which a citizen is entitled to feel is against public policy." *Mills* v. *Town Plan & Zoning Commission,* 144 Conn. 493, 498, 134 A.2d 250. The action of the commission was clearly unreasonable and arbitrary.