[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case is an appeal from the November 26, 1991 decision of the Windsor Town Planning and Zoning Commission (commission) to deny the application of Alford Associates, Inc. to change the zone of a 1.99-acre parcel of land known as No. 70+/- Dunfey Lane in Windsor from agricultural (AG) to business (B-2). As a co-owner both of the subject parcel and of the property immediately to its south, plaintiff Joseph Cicero, Jr. complains on several grounds that the commission acted illegally, arbitrarily and capriciously when it voted 4-1 to deny the requested change of zone because it "would impact the traffic . . . and . . . change the character of the neighborhood."
The record reveals that No. 70+/- Dunfey Lane is an CT Page 1551 undeveloped, heavily wooded lot located less than one hundred feet to the west of the southbound lane of Interstate 91, just north of Exit 37 onto Bloomfield Avenue in Windsor. On its south it is bounded by the plaintiff's ten-acre, business (B-2) zoned property, which is currently the site of two abandoned motel buildings and an abandoned tavern. On its north, east and west, it is bounded by a larger property, zoned restricted commercial (RC), which contains the vacant premises of a former residence inn. So surrounded by business and commercial properties, No. 70+/- Dunfey Lane is completely cut off from all public roadways.
By contrast, the plaintiff's ten-acre property to the south fronts directly onto Bloomfield Avenue and is bordered on the west by Dunfey Lane. Bloomfield Avenue is a major east-west thoroughfare heading westward towards Bloomfield, past a large public safety complex, an industrial park, and intersections with several residential streets. Dunfey Lane is a dead-end street leading northward from Bloomfield Avenue, past the entrance of the former residence inn to a quiet, residential neighborhood known as Valley Village. To the west of Dunfey Lane, on the other side of a narrow treeline, are the Windsor Woods Condominiums. To their west, in turn, across adjacent Mountain Road and for several blocks beyond, lies a large residential neighborhood featuring single-family houses along quiet residential streets. This area is accessed from the south via a series of connecting streets leading northward from Bloomfield Avenue.
The applicants filed their application to change the zone of No. 70+/- Dunfey Lane on October 22, 1991. In it, they represented that their principal, The Bronson Hutensky Company, intended to put the subject parcel to "commercial [use] in accordance with Section 5.2 of the Windsor Zoning Regulations [W.Z.R.]." Such a use, they averred, would be consistent with the Windsor Town Plan of Development, for "[t]he Plan shows the site to be restricted business." The granting of a zone change to accommodate that use, they claimed, would benefit the Town because "[t]he site is landlocked and not viable as an agricultural property."
After due notice of this application was published, it was scheduled for a full public hearing on November 12, 1991, then rescheduled for November 26, 1991, when both the applicants and the public were given a full opportunity to be heard as to the CT Page 1552 merits of the proposed zone change. At the hearing, the applicants explained that their principal's purpose for seeking to change the zone of No. 70 +/- Dunfey Lane was to enable its owners, including the plaintiff, to combine it with their larger parcel to the south in order that the two parcels together could be developed as the site of a new, 65,000-square-foot Super Stop 'N Shop. Under their plan, the new super supermarket would be constructed on the larger, southern parcel while the subject parcel would be partially cleared for the digging of a storm water retention pond. Combined as a result of the requested zone change, the two parcels would be large enough to support the proposed development without violating the maximum density requirements for a B-2 zone. Separately, however, neither parcel is large enough to be so developed, or thus to be put to what the applicants and their expert real estate appraiser, Pamela Stratton, described as its "highest and best use".[1]
The applicants conceded that even if their application were denied, the larger, southern parcel could be developed as the site of a smaller, less profitable commercial enterprise. As for the subject parcel, however, they argued that a decision not to rezone it would both violate local zoning regulations by failing to eliminate a nonconforming use and deprive its owners of their right to use and enjoy it. Currently, they noted, the subject parcel is nonconforming because it fails to meet the 3-acre minimum-lot-size requirement for an agricultural zone. W.Z.R. 10.1. Therefore, they argued, it cannot be built upon or otherwise more intensively developed, even for agricultural purposes, without enlarging upon or increasing an existing nonconformity, in violation of W.Z.R. 2.3.2(A).
Because, moreover, the subject parcel is completely cut off from public roadways by the business and commercial properties which surround it, the applicants claimed that it cannot be used for any lawful purpose without violating the separation-of-incompatible-uses requirement of W.Z.C. 2.1.16.[2] Under that requirement, access to property situated in one zone cannot lawfully be had through property in a different zone unless the use being served in the accessed zone is also permitted in the zone through which access is had. Here, they concluded, since agricultural uses are not permitted in business or commercial zones, the only way to afford the owners lawful access to their parcel is to assign it to the same zoning district as one of the properties that surround it. CT Page 1553
The applicants advanced two primary reasons why the subject panel should be rezoned to B-2 rather than RC. First, while the subject parcel is large enough to satisfy the 15,000 square-foot minimum-lot-size requirement for a B-2 zone, it is too small to satisfy the 5-acre minimum-lot-size requirement for an RC zone If the parcel were to be rezoned RC, it would be nonconforming ab initio. Second, the applicants claimed that rezoning the subject parcel to B-2 would be consistent with the Town Plan of Development, for the Plan shows the property to be "commercial" rather than "restricted business".[3]
On this basis, they concluded that the only way to ensure that the owners of the subject parcel could use and enjoy their
In further support of their application, the applicants called several witnesses to testify as to the projected impact of the proposed development on the surrounding area. Applicant Wilson Alford, Jr. testified that the new super supermarket would be built at the same location on the larger, southern parcel where the abandoned motel buildings now stand. Access to the store would be gained by turning off Bloomfield Avenue onto Dunfey Lane, with all customer parking to the south of the store and loading docks to the north. No material alterations would be made to the greenery shielding the building from its residential neighbors to the north and northwest, and new lighting would be limited, both in intensity and direction of illumination, so as not to disturb nearby neighborhoods any more than they are already disturbed by the overhead lights along I-91.
Bennett Brooks, an acoustical engineer with United Acoustics Consultants, then testified to the results of a noise impact assessment he had made on behalf of the applicants. Comparing existing noise levels in the surrounding residential areas with those that would be generated by the proposed super supermarket, Mr. Brooks stated that any new noises from parking lot traffic, the sounds of delivery trucks or the hum of refrigerating equipment would simply blend into existing background noise from I-91 without elevating current decibel levels. Though closely questioned by several commissioners as to the validity of his methodology and comparison data, Mr. Brooks insisted that "all of the noises that we know are associated with supermarket operations are below what already exists at the site, so . . . based on all of that engineering data, there is no impact that we can foresee or expect on the CT Page 1554 neighborhood due to noise from this site."
Finally, the applicants called traffic engineer Tim Sorenson from Greiner, Inc. to testify as to the results of a traffic impact study[4] he had conducted to evaluate existing traffic conditions in the area, to assess the likely impact of the proposed development on that area, and to "determine what improvements might be required to help mitigate the traffic in such a way that delay is not affected and made any worse." Mr. Sorenson testified that while traffic volume during peak hours would increase substantially due to the expected influx of grocery shoppers who would not otherwise be traveling on the local road system[5], the levels of service[6] at local intersections could be maintained at their present level, if not improved, with the making of certain planned improvements in road width, signal placement and lane designations in the immediate area of the new super supermarket.[7] On that basis he concluded that the new construction would hale no adverse impact on traffic congestion in the area.
Several persons spoke in opposition to the applicants' request in view of the adverse impact they feared it would have on local traffic congestion and the quality of life in their neighborhoods. Addressing the particulars of the applicants' proposal for the development of a Super Stop 'N Shop, they first questioned the validity of Mr. Brooks', noise impact assessment, claiming that he had failed to differentiate between existing levels of background noise at peak and off-peak hours or to consider the potential for increased noise associated with the simultaneous presence of more than one delivery truck on Dunfey Lane or to the north of the planned super supermarket at the loading docks. They also questioned the impact on the neighborhood of additional lighting from a 24-hour superstore, noting that it would create a "football-field" atmosphere that might lead to an increase in local crime. Additionally, they questioned the placement of dumpsters on the north side of the property, objecting to the increased risk of vermin it would create.
Others, noting the already dangerous traffic conditions on Bloomfield Avenue at its intersections with Dunfey Lane and other streets to the west of I-91, objected that the projected increase of hundreds of extra vehicles per hour at those intersections would only make a bad situation worse. Concerns were thus expressed about safety along main thoroughfares such CT Page 1555 as Bloomfield Avenue, likely delays in the response time of emergency vehicles departing from the Public Safety Complex further west along Bloomfield Avenue to other parts of Windsor, increased traffic backup at existing intersections, increased danger to pedestrians and motorists alike on, side roads off Bloomfield Avenue, and increased danger to children on and waiting for school buses on nearby streets and roads.
Attorney John Wall, representing residents of the Windsor Woods Condominiums, presented further objections to the requested zone change on grounds that the traffic study submitted by the applicants understated the likely impact of their proposed development on the local traffic system. To that end, he presented the testimony of traffic engineer Allan Young, who had analyzed the Greiner Traffic Study and compared it with a prior study of the same road system. Mr. Young criticized the Greiner study in several respects: first, in its reliance upon Stop 'N Shop marketing data rather than "standard engineering procedures" to estimate traffic distribution throughout the affected area; second, in its basing of estimates of post-development levels of service at local intersections on the installation of new traffic signals and the making of other improvements which were not yet in place and might never be approved; and third, in its reliance upon data from traffic counts that had been made at a time when traffic in the area was significantly reduced because of intensive construction on nearby sections of I-91. On this latter point he noted that the Greiner study's relevant traffic counts were a full 17 percent below similar counts made two years earlier, before the highway construction project on I-91 had begun.
Finally, the commission heard from Town Traffic Engineer Wayne Radke and Town Manager Dr. Mario Zavarella. Mr. Radke reported that while levels of service at local intersections could indeed be maintained after the construction of a super supermarket, that would only happen if the proposed road improvements were also made. In addition, he stated that the proposed construction and resulting increase in traffic would put a substantial additional burden on the existing road system, bringing it closer to full capacity in a shorter period of time than other, less intensive commercial uses of the properties would entail.
Agreeing with this assessment, Dr. Zavarella recommended CT Page 1556 to the commission that they reject the proposed change of zone, stating that in his estimation, it would increase local traffic substantially for a rather small additional development in the affected area. Dr. Zavarella also flatly stated that under the Town Plan the property in question was marked RC — Restricted Commercial, not B-2 Business.
At the conclusion of the hearing, four of the five commissioners voiced their displeasure with, the request for a zone change, then approved the motion of Commissioner Dzurenda "to deny this application on the grounds that it would impact the traffic . . . and it would change the character of the neighborhood." This decision was duly published on November 29, 1991, and this appeal followed.
 I
This Court's jurisdiction over appeals from the decisions of local planning and zoning commissions arises under Sections8-8 and 8-9 of the Connecticut General Statutes. Section 8-8
provides in part that:
 (a) [a]ny person . . . aggrieved by any decision of [a municipal land use] board, or any person owning land which abuts . . . any portion of the land involved in decision of said board, . . . may . . . take an appeal to the superior court for the judicial district in which such municipality is located [.]
Section 8-9, in turn, provides that "Appeals from . . . planning and zoning commissions may be taken to the superior court in the manner provided in Section 8-8."
Under these provisions, the plaintiff has standing to prosecute this appeal for two independent reasons. First, as a co-owner of No 70+/- Dunfey Lane, he is "aggrieved" by the decision of the defendant commission within the meaning of Section 8-8. See Bossert v. Norwalk, 157 Conn. 279, 285
(1968)(establishing, inter alia, that the owner of any property which becomes the subject of a municipal land use board's decision is always "aggrieved" by that decision for the purpose of appealing to this Court). Second, as a co-owner of the larger property immediately to the south of the subject parcel, CT Page 1557 he is also a "person owning land which abuts . . . any portion of the land involved in [the challenged] decision [.]" Conn. Gen. Stat. 8-8. This Court therefore has jurisdiction over this case.
 II
In ruling on a zone change application, a local planning and zoning commission acts in its legislative capacity. Burnham v. Planning Zoning Commission, 189 Conn. 261, 265
(1983). When it acts in that capacity, it is vested with a "wide and liberal discretion" as long as it acts within its prescribed powers. Id.
"The courts allow zoning authorities this discretion in determining the public need and the means of meeting it, because the local authority lives close to the circumstances and conditions which create the problem and shape the solution." Cameo Park Homes, Inc. v. Planning Zoning Commission, 150 Conn. 672, 677 (1963). "Courts, therefore, must not disturb the decision of a zoning commission unless the party aggrieved by that decision establishes that the commission acted arbitrarily or illegally." First Hartford Realty Corporation v. Planning Zoning Commission, 165 Conn. 533,541 (1973).
Where a town, such as Windsor, has formally decided to administer its local zoning practices under the provisions of Chapter 124 of the General Statutes, the commission's decision to grant or deny a change of zone must be made in compliance with the requirements of General Statutes 8-2. At the time of the decision herein challenged, Section 8-2 provided, in pertinent part, as follows:
 [All local zoning] regulations shall be made in accordance with a comprehensive plan and shall be designed to lessen congestion in the streets; to secure safety from fire, panic, flood and other dangers; to promote health and the general welfare; to prevent the overcrowding of the land; to avoid undue concentration of population and to facilitate the adequate provision for the transportation, water, sewerage, schools, parks and other requirements. CT Page 1558
The foregoing provisions naturally give rise to a two-part test for determining legality of a local zoning authority's ruling on a zone change application: first, was the ruling in question made "in accord with [the town's] comprehensive plan;" and second, was the ruling "reasonably related to the normal police power purposes enumerated in 8-2." First Hartford Realty Corporation v. Planning Zoning Commission, supra at 541.
"A comprehensive plan has been defined as a general plan to control and direct the use and development of property in a municipality . . . by dividing it into districts according to the present and potential use of the properties." Summ v. Zoning Commission, 150 Conn. 79, 87 (1962). The comprehensive plan for Windsor, as for most Connecticut towns, consists of its local zoning regulations and of the zoning map which has been established pursuant thereto. It is the requirement of Section8-2 that any ruling on a zone change application must be "in harmony with the comprehensive plan." Burnham v. Planning Zoning Commission, supra at 267.
As for the requirement that the commission's ruling on a zone change application be reasonably related to the legitimate purposes of zoning enumerated in 8-2, it must first be noted that the denial of such an application need never be accompanied by a statement of the reasons therefor. Calandro v. Zoning Commission, 176 Conn. 439, 441 (1979). Thus, on an appeal from such a denial, the trial court must be prepared to search the entire administrative record for evidence supporting the commission's decision on any of grounds listed in Section8-2. Even then, if the commission does state reasons for its ruling, the task of the reviewing court is not necessarily limited to assessing the legal and factual sufficiency of those reasons; for if the only stated reasons are unclear or erroneous, the court must go on to decide if the record establishes any other valid basis for the ruling. Stankiewicz v. Zoning Board of Appeals, 15 Conn. App. 729, 732, aff'd211 Conn. 76 (1989). "If any reason culled from the record demonstrate[s] a real or reasonable relationship to the general welfare of the community, the decision of the commission must be upheld." Parks v. Planning Zoning Commission, 178 Conn. 657,662-663 (1979). (Emphasis in original).
III CT Page 1559
The plaintiff's first two claims of error are related, for both are addressed to the commission's first stated reason for its decision. For the following reasons, the Court concludes that neither of these claims has merit.
The plaintiff's first claim is that the commission employed an improper legal standard when it based its denial of the instant application on the ground that it "would impact the traffic" in the area. This claim is based on a comparison between the wording of the commission's decision and that of Section 8-2. Whereas the commission's conclusion was framed in broad language which the plaintiff characterizes as "vague" and "non-specific", the pertinent statutory purpose of zoning — "to lessen congestion in the streets" — has been narrowly defined to mean the reduction of local traffic density rather than the reduction of overall daily traffic volume. Pecora v. Zoning Commission of Trumbull, 145 Conn. 435, 439 (1958). Claiming that the commission never tied its impact-on-traffic finding to the more limited statutory standard, the plaintiff argues that its ruling must be overturned because it does not reasonably relate to any legitimate purpose of zoning described in Section8-2.
This argument lacks merit for several reasons. First, it wrongly presupposes that the limited function of this Court is to review the decision here challenged on the basis of the commission's stated reasons therefor. This, however, is simply not the case. See Part II of this Memorandum of Decision, supra. To reiterate, if any reason culled from the administrative record reasonably supports the commission's denial of the requested zone change, that denial must be sustained on appeal.
The plaintiff's argument, moreover, puts an undue burden on lay commissioners to articulate their rulings with lawyer-like precision. Our courts have long held that the rulings of local land use commissions must be sustained, even if they are inartfully phrased, as long as they are reasonably supported by the administrative record. See, e.g. DeMars v. Zoning Commission, 142 Conn. 580, 584 (1955). Great deference is paid to the decisions of local commissioners because of their familiarity with the sources of and solutions to local land use problems, not because of their legal acumen. CT Page 1560
Here, then, the final reason why the plaintiff's argument must be rejected is that each of the commissioners who voted against the instant application specifically objected to the proposed zone change because of its projected adverse impact on local traffic congestion. One commissioner predicted that if the zone change were granted and the applicants' planned development proceeded, "It's going to cause huge traffic jams. . . ." Another contended that if the change, of zone were granted there would be "substantial additional congestion" in the residential streets to the north and west of the proposed development. A third specifically voiced concerns about the clogging of Dunfey Lane — currently a residential street, though in the future, with the proposed development in place, the only vehicular access route to the new Super Stop 'N Shop. In sum, these commissioners' broadly stated finding that the zone change "would impact the traffic" was clearly based on their conclusion that it would result in increased local traffic congestion.
The question thus arises whether the record before the commission reasonably supported this conclusion. In his second claim of error, the plaintiff contends that does not.
In support of his claim, the plaintiff points to the testimony of Mr. Sorenson, the applicants' traffic expert, and Mr. Radke, the Windsor Town Traffic Engineer. Their combined testimony, he asserts, gave the commission an unassailable basis upon which to conclude that local traffic congestion would not increase even if the zone change in question were approved, the subject parcel and the plaintiff's larger, southern parcel were combined, and the proposed Super Stop 'N Shop — concededly the most intensive use of the combined properties — were built.
In fact, however, there are many valid reasons why the commissioners might not only have rejected these experts' testimony, but relied upon it and other relevant testimony in the record to reach the opposite conclusion. First, of course, it is axiomatic that a local land use commission has the power to believe or disbelieve any witness who comes before it. Burnham v. Planning Zoning Commission, supra at 265. The commissioners would thus have been well within their rights to discredit either or both of these witnesses, notwithstanding their expert credentials. CT Page 1561
Second, the commissioners had ample reason to challenge the factual assumptions on which these experts' projections were based. While both agreed that good "levels of service" could be maintained at local signal lights and intersections even after the zone change in question was granted and the proposed supermarket was built, their projections could easily have been faulted in at least two respects: first, as suggested by opposing traffic engineer Allan Young, the base traffic counts at the pertinent lights and intersections were substantially lower than others that had been made in a prior study when nearby sections of I-91 were not under construction; second, the projected influx of grocery shoppers to the area was based on Stop 'N Shop marketing data rather than what Mr. Young referred to as "standard engineering procedures." The commissioners might well have rejected the calculations of Mr. Sorenson based on their doubts about his methodology.
A third basis upon which the commissioners might have discounted the testimony of the applicants' expert was their own substantial experience in travelling on the local road system and resolving local traffic congestion and road safety issues in other zoning cases. It is well settled in Connecticut that local land use commissioners may rely upon their own knowledge and experience, instead of or in addition to the testimony of interested parties and their experts, in deciding all but the most sophisticated of technical issues. Feinson v. Conservation Commission, 180 Conn. 421, 427 (1980). Matters such as traffic congestion and street safety have long been held to be so readily within the knowledge of lay land use commissioners as to be properly subject to decision based upon that knowledge. Id. Here, then, the commissioners could properly have based their decision to deny the requested change of zone on a common sense, experience-based assessment of the likely impact a projected 55% to 150% increase in peak-hour traffic volume would have on local traffic congestion.
A final, important reason why the commissioners were virtually required to deny the instant application is that the projected ability of the local road system to handle the expected influx of up to 964 cars per hour in peak traffic hours was based explicitly on proposed changes in local roadways that had not even been proposed to the State Traffic Commission[8], much less built. Mr. Sorenson candidly stated that the third reason why he conducted his traffic study was "to determine what improvements might be required to help CT Page 1562 mitigate the traffic in such a way that delay is not affected and made any worse." In so stating, he implied what his testimony and written report clearly demonstrated: that necessary improvements to accommodate the future traffic flow had been planned but not yet made. Thus, though the developer was clearly willing to make such improvements if the zone change were granted and its site plan were approved, they were not yet in place, and could not be put in place until the State Traffic Commission approved them. That being so, the commissioners could reasonably have concluded that at present the existing road system would be congested to the breaking point by the granting of the requested zone change and the development it might entail.
Similar questions have previously arisen in a number of Connecticut cases.
 [T]hese cases indicate that a change of zone which is dependent for its proper functioning on action by other agencies over which the zoning commission has no control cannot be sustained unless . . . the necessary action appears to be a probability. [Citations omitted.] In the absence of some reasonable assurance . . . that provision would be made for the requisite highway and traffic flow changes for the purpose of alleviating traffic congestion the commission ha[s] no authority to change the zone.
Wilson Planning Zoning Commission. 162 Conn. 19, 25 (1971) (holding that a traffic expert's assurances that "anticipated traffic can be readily accommodated by [a] proposed improved highway travelway and anticipated modernized controls" was inadequate to afford the commission "reasonable assurance" that traffic congestion resulting from a zone change would be alleviated). Accord, Jarvis Acres, Inc. v. Zoning Commission,163 Conn. 41, 51 (1972) (evidence that personnel from the state highway department had stated that road widening necessary to handle traffic congestion expected to result from a zone change would be begun by a date certain, and that the General Assembly had appropriated money for that purpose was "not enough evidence on which a commission could conclude that there was a `reasonable probability' that the [requisite] improvements . . . CT Page 1563 would be instituted and the traffic problem solved so as to justify the granting of a zone change.") Where, in sum, the administrative record contains no "reasonable assurance" that proposed improvements necessary to alleviate congestion expected to result from a zone change will be made, the application requesting that zone change must be denied. The record in this case contains no evidence whatsoever that the significant improvements in local roadways the developers acknowledge to be necessary to accommodate their planned development will ever be approved, much less made. Therefore, the defendant commission properly denied the requested change of zone.
 IV
In light of the foregoing conclusion, the plaintiff's third claim of error need not be decided. In that claim, the plaintiff challenges the sufficiency of the administrative record to support the commission's other stated basis for decision: that it "would affect the character of the neighborhood." As long as the administrative record afforded the commission any valid basis for its ruling, that ruling must be upheld. Parks v. Planning Zoning Commission, supra at 662-663.
 V
The plaintiff has also complained that the commission's decision was illegal, arbitrary and capricious because it failed to accord with the Town of Windsor's comprehensive plan. Specifically, he claims that by leaving the subject parcel in an agricultural zone, the commission engaged in illegal "spot zoning", failed to terminate a nonconforming use, and failed to harmonize the use of that property with the Town Plan of Development.
The gravamen of these claims is that in spite of the broad discretion with which local zoning authorities may act when they rule in their legislative capacity, the defendant commission had no lawful choice but to grant the instant zone change application. Because, however, this Court has already identified one entirely valid basis in the administrative record for the commission's lawful exercise of its discretion, it need not go on to address these claims in order to decide this case. Again, it is a matter of axiom that CT Page 1564
 if any reason culled from the record demonstrated a real or reasonable relationships to the general welfare of the community, the decision of the commission must be upheld.
Parks v. Planning Zoning Commission, supra at 662-663. (Emphasis in original.
 VI
The plaintiff's final claim of error is that by denying the instant zone change application the defendant commission rendered No. 70 +/- Dunfey Lane incapable of use for any lawful purpose, and thus confiscated the property in violation of the Due Process Clauses of our State and Federal Constitutions. In support of this claim, the plaintiff argues, as he did before the commission, that unless the subject parcel is reassigned to the same zone as one of the properties that surround it, it can never be accessed from a public highway, and thus can never be used for any purpose, without violating Section 2.1.16 of the Windsor Zoning Regulations. Section 2.1.16 prohibits access to a landlocked property of one zone through property in a different zone unless the property through which access is gained is in a zone which permits the use being served by the access route. For that to be possible in this case, he claims, it must be permissible to engage in agriculture in a B-2 or an RC zone. Since it is not, he concludes, the subject property — zoned agricultural but surrounded by B-2 and RC properties — can never lawfully be accessed, and therefore can never be used.
The test for determining whether a decision by a local zoning authority operates to confiscate a property to which it applies has been stated as follows in Chevron Oil Co. v. Zoning Board of Appeals, 170 Conn. 146, 151 (1976).
 [T]he determination of whether a taking has occurred must be made on the facts of each case with consideration being given not only to the degree of diminution of the value of the land, but also to the nature and degree of the public harm to be prevented and to the alternatives available to the landowner. [Citations omitted.] The CT Page 1565 financial effect on a particular owner must be balanced against the health, safety and welfare of the community. [Citations omitted.]
Under this test, the main factor in determining whether the application of a regulation to a taking is the amount of the owner's actual loss. Luf v. Southbury, 188 Conn. 336, 349
(1982). Though the loss need not be total to justify the finding of a taking, it must at least be "significant", Corthouts v. Newington, 140 Conn. 284 (1953). This, in turn, requires both that the property in question have been deprived by the relevant regulation or decision of most or all of its potential economic value, and that the determination of the relevant land use agency claimed to have resulted in such deprivation have become so fixed and final as to preclude other potential uses of the property. Brecciaroli v. Commissioner of Environmental Protection, 168 Conn. 349, 357-358 (1975) (holding that confiscation did not occur when the property owner was denied a permit to fill a tidal wetland since permission could still be sought to fill smaller areas, and all beneficial uses of the property were not precluded). In sum, the prevailing rule requires any plaintiff claiming confiscation to exhaust all of his reasonably available options before asserting that he has become the victim of an unconstitutional taking.
In this case it is plain that the plaintiff's subject parcel has not been confiscated by the Windsor Planning 
Zoning Commission's refusal to rezone it B-2. The first reason for this conclusion is that the land is currently usable as agricultural land, and can lawfully be developed for any agricultural purpose despite its minimum-lot-size nonconformity. While it is the undoubted policy of the Windsor Zoning Regulations to eradicate nonconforming uses, once such a use is established, it may continue uninterrupted without violating local regulations. The continuation of a nonconforming use is not an unlawful expansion or extension of that use.
As for access to the subject parcel from public roadways, the plaintiff has several options which the record fails to show that he cannot pursue. He may, as the defendant suggests, ask the defendant to rezone the parcel RC, which accords with the Town Plan of Development. This, in turn, would allow him CT Page 1566 to sell the property to the owners of the RC property to the north, for what might well be a significant financial return. The record hardly shows that such a course of action would be legally impossible or financially disastrous. All it shows is that the applicants' expert appraiser did not consider it to be the "highest and best use" of the subject parcel, and that is hardly a proper basis upon which to conclude that it would thereby lose all or most of its value.
Other alternatives also exist. The plaintiff might seek to rezone a piece of his larger, southern parcel agricultural in order to afford lawful access to the smaller, northern parcel. Or, he might simply seek a variance to permit him to gain access through an incompatible zone. In any event, he has afforded this Court no proof that the decision of the defendant commission irrevocably sealed the subject parcel's fate as an inaccessible, agriculturally zoned island, of no use or economic benefit to its owners.
For the foregoing reasons, the commission's challenged ruling cannot be held to have resulted in an unconstitutional taking of No. 70+/- Dunfey Lane. Without convincing proof that that ruling resulted in any permanent economic detriment to the plaintiff, much less a total or substantial loss of the economic value of his property, the plaintiff's claim of confiscation must be rejected.
 VII
Accordingly, for all of the reasons herein stated, the decision of the Windsor Planning Zoning Commission to deny a change of zone to No. 70 +/- Dunfey Lane is affirmed, and the plaintiff's appeal therefrom is dismissed.
Michael R. Sheldon Judge