[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Acorn Homes, Inc. (Acorn) appeals from a decision of the Town of Brookfield Inland Wetlands Commission (Commission) issued after a hearing on June 1, 2000 upholding a cease and desist order dated May 26, 2000 which directed Acorn to stop certain clearing activities on a 52 acre parcel of land owned by Acorn and located on Elbow Hill Road in Brookfield (Elbow Hill plot).
Notice of the Commission's action was published on June 6, 2000. Acorn filed and served its appeal of the Commission's action on June 14, 2000 in a timely fashion.
 I JURISDICTION
The president of Acorn, Alan Weiner, testified and submitted a deed showing that Acorn is the owner of the Elbow Hill plot where the activities which were the subject of the cease and desist order took place. Acorn is an aggrieved party. General Statutes § 22a-43;Winchester Woods Associates v. Planning Zoning Commission, 219 Conn. 303
(1991). The court having found aggrievement and the appeal being timely, the court has subject matter jurisdiction over the appeal.
 II FACTS
Weiner transferred the Elbow Hill plot to Acorn in 1992. Prior to that, the Commission had issued a permit for regulated activities on the Elbow Hill plot in July, 1990 — Permit 89-38. (Return of Record ("ROR") Item 3.) This permit was extended by the Commission on several occasions, most recently a three year extension granted in 1997 and expiring on or about July 22, 2000. (ROR Item 18, Exhibit J.) The permit was originally granted in 1990 for a project known as "Summerset" a multi-family residential complex which apparently was never built. The permit contained numerous restrictions and conditions, and the relevant ones will be discussed below.
In March, 2000, Acorn applied to the Brookfield Planning Commission for approval of a revised development project on the Elbow Hill plot (ROR "Findings," ¶ 10). At a wetlands commission meeting on May 8, 2000, the Commission raised several concerns about the revised project mainly involving new wetlands designation and sewage discharge. As a result of these concerns, the Commission voted to require Acorn to submit a new application for a permit for the revised project. The Commission action noted that the existing permit remained valid and in effect. (ROR Item CT Page 3499 4.)
On or about May 25, 2000, Acorn commenced regulated activities on the Elbow Hill plot. According to the Brookfield land use officer who testified at the subsequent hearing, Clare Anne Walsh, Acorn cleared land for a distance of 150 feet on either side or a stream, and more than 100 feet from the stream. (ROR Item 20, Transcript ("Tr.") pp. 3-4.) Perhaps as much as 30,000 square feet were cleared. (Tr. p. 9.) Acorn concedes that cutting and clearing took place within a regulated area. (See Tr. pp. 8, 12-15, 17.)
On May 26, 2000, the Commission issued a cease and desist order to Acorn directing it to:
 cease and desist activity on [the Elbow Hill plot] including but not limited to: excavation, tree removal and vegetative cutting within or near any wetlands or watercourses on the premises or surrounding properties; or any activities associated with [Permit 89-38].
The order further stated that a hearing would be held on June 1, 2000 at which Acorn could show cause why Permit 89-38 should not be revoked. (ROR Item 16.)
The order set forth several reasons for its issuance. First, it stated that Acorn had not complied with five conditions set forth in the original permit. Second, the Commission had not issued any permit for regulated activity with regard to the "new project." Third, there was no planning or zoning approval for the project which was the subject of Permit 89-38, and therefore the permit could be not utilized. (Id.)
At the hearing on June 1, 2000, the Commission heard testimony from the land use officer, Weiner, Acorn's president, and reviewed various exhibits. A draft of findings of facts was reviewed, amended slightly and approved. The Commission decided to uphold the cease and desist order issued on May 25, 2000. (ROR Item 22.)
 III STANDARD OF REVIEW
When an inland wetlands commission grants, denies or limits a permit for regulated activity, the General Statutes require that it set forth on the record the reasons for its decision. General Statutes §22a-42a(d)(1). On appeal, the Superior Court must examine the record and CT Page 3500 "[t]he evidence . . . to support any such reason must be substantial. . . ." Huck v. Inland Wetlands WatercoursesAgency, 203 Conn. 525, 540 (1987). A commission's decision can be sustained if any one of the proffered reasons is supported by substantial evidence. Id., 539-540. Substantial evidence may be something less than the weight of the evidence and may be evidence from which two inconsistent conclusions can be arrived at. Id., 541 (quoting Consolo v. Federal Maritime Commission,383 U.S. 607, 620 (1966)).
 IV DISCUSSION
In its appeal, Acorn raises four partially interrelated arguments for overturning the Commission's action. These are: (1) that the Commission prejudged the matter by relying on draft findings prepared before the June 1, 2000 hearing; (2) the alleged reasons for the cease and desist order were not substantiated; (3) the Commission made it difficult for Acorn to comply with the existing permit; and (4) the cease and desist order was improperly issued.
 A THE "DRAFT" FINDINGS OF FACT
Acorn contends that the Commission prejudged the matter prior to the June 1, 2000 hearing and, as evidence of this, points to a draft of findings which was prepared by counsel for the Commission and presented at the hearing. It appears undisputed that the draft was prepared before the hearing took place. (Tr. pp. 20-21.)[1]
It is axiomatic that proceedings before an administrative agency, such as the case here, must be fair, and the agency must be impartial and unbiased. Proceedings, in the rather flamboyant language of our Supreme Court, "must be conducted so as not to violate the fundamental rules of natural justice." Connecticut Fund for the Environment, Inc. v.Stamford, 192 Conn. 247, 249 (1984). A claim of prejudgment or predisposition requires persuasive proof. Agency members are presumed to be unbiased. Simko v. Ervin, 234 Conn. 498 (1995); OG Industries v.Planning Zoning Commission, 232 Conn. 419 (1995).
The Findings in its original form consisted of six typewritten double spaced pages containing nineteen separate paragraphs and a seventh page with a conclusion that the cease and desist order "was properly issued and should be upheld." The majority of the paragraphs are unexceptional CT Page 3501 and recited the past history of the Elbow Hill plot, delineating for instance each of six extensions of the permit. Other findings, however, go to the heart of the controversy, and while some of them may be undisputed, the Findings were clearly drafted, as its conclusion suggests, to support upholding the cease and desist order. When the Findings were first unveiled at the June 1, 2000 hearing, counsel for Acorn immediately and forcefully objected to them on prejudgment grounds. (Tr. p. 20.)
The Commission chairman made it clear that the document was a "draft" (id.) and read the draft findings into the record at the meeting (id.21-23) after urging Commission members to make any additional comments or additions. (Id. 20, 21-23.) After the reading, several amendments were adopted; one member described the draft as "perfect." (Id. 24-25.) The Findings were eventually approved, as amended. (Tr. p. 27, ROR Item 22.)
The question whether the Commission predetermined the outcome of the hearing before the hearing was held is a question of fact. Pecora v.Zoning Commission, 145 Conn. 435 (1958). It has been held on several occasions that use of a previously prepared motion or other document by a municipal commission to formulate a decision or focus consideration does not equate to predetermination. See e.g. Hanson v. Glastonbury TownCouncil, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV93-052 1154 (May 5, 1994, Sullivan, J.); Petersonv. Redding Planning Commission, Superior Court, judicial district of Danbury, Docket No. CV90-0302916 (December 2, 1992, Riefberg, J.); Fundfor Animals v. Town Planning Zoning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, CV91-0396816 (February 1, 1993, Norko, J.). Nevertheless, the appearance midway through a show cause hearing of a neatly typed seven page document containing an adverse determination of the very issue ostensibly still being heard and considered is disconcerting to the parties and disquieting to the court. As a purely cautionary matter, the court observes that the practice does not enhance either the actuality or the appearance of fairness. A better approach might include drafting alternative findings and conclusions on the critical issues for the Commission's consideration. That having been said, it is apparent from the record that Acorn and its counsel had ample opportunity to examine witnesses and present its case before the Commission undertook consideration of the draft Findings. There is no evidence that any Commission member saw the Findings before the hearing or before the witnesses testified. The Commission chairman made clear the task facing the Commission at the hearing was to determine whether to keep the cease and desist order in effect, revise it or withdraw it. (Tr. p. 16.) A full review of the record shows insufficient evidence for the court to find that the Commission members had made up their minds regardless of what CT Page 3502 Acorn said or what evidence it produced at the hearing. Daviau v.Planning Commission, 174 Conn. 354 (1978).
 B THE PERMIT AND THE CEASE AND DESIST ORDER
Acorn contends that its activities which were the subject of the cease and desist order were within the limits allowable under Permit 89-38, and there was a lack of substantial evidence in the record to uphold the order. At the hearing, Acorn attempted to show that its clearing activities at the Elbow Hill plot were within the parameters indicated in its original application and allowable under the permit. The land use officer on the other hand attempted to show that Acorn's clearing activities exceeded what was allowable under the permit. The record is cloudy on this point because at the hearing both Acorn's counsel and the land use officer gestured or pointed to the 1990 site plan for "Summerset" (ROR Item 18, Exhibit A) and the actual references to where the activities took place are difficult to follow with only a typed transcript of the hearing available. The court is therefore unable to determine whether the clearing operations extended physically beyond what was allowable under the permit.
The Commission does not rely solely on that argument but offers another contention to show that Acorn's activities were not allowed by the permit. The Commission points out that on May 8, 2000 it had decided that Acorn would have to submit a new application for permission to do regulated activities on the Elbow Hill plot. (ROR Item 4.) The new permit application was required because of inter alia possible changes in the wetlands areas in the ensuing ten years since the issuance of Permit 89-38 and the changes proposed by Acorn in its new Summerset project. Nevertheless, the Commission noted the existing permit was still valid, and that is what is at issue here.
The Commission's Findings concluded that Acorn had not satisfied the preconditions set by Permit 89-38 before it started its clearing activities (ROR Findings, ¶ 16). Specifically, the permit required: (1) a preconstruction meeting before each phase of the project between a representative of the Commission, Acorn, the Commission's consultant and a soil erosion and sediment control officer; (2) the appointment of an enviromnental monitor paid by Acorn and approved by the Commission; (3) no trees were to be removed before the preconstruction meeting; and (4) the posting of a $60,000 bond (ROR Item 3). To some extent, Acorn concedes these failures, but minimizes their importance. On June 1, 2000, counsel for Acorn wrote the Commission saying no preconstruction meeting had been set up or a bond posted because the tree cutting was not CT Page 3503 "construction." The letter continued that Acorn wanted a preconstruction meeting and suggested June 5 as the date at which time the bond would be posted. An environmental monitor was also named. (ROR Item 17, Exhibit H.)
The problem with Acorn's position is that the permit required those steps prior to any regulated activity being undertaken. While one might argue about the importance of the timing of those conditions and also argue (as Acorn has) that the Commission made it difficult to comply with some of the conditions, the Commission was correct in finding that the conditions were not complied with.
The Commission also found that Acorn's activities were in violation of General Statutes § 22a-42a(d)(1) which states in part:
 No person shall conduct any regulated activity within an inland wetland or watercourse which requires zoning or subdivision approval without first having obtained a valid certificate of zoning or subdivision approval, special permit, special exception or variance or other documentation establishing that the proposal complies with the zoning or subdivision requirements adopted by the municipality. . . .
(ROR Findings ¶ 18.) The Commission points out that Acorn has never received planning and zoning approval for his Summerset project, either the 1990 version or the 2000 version. Indeed, the latest application is still pending (ROR Item 5). There is no question that regulated activities were undertaken by Acorn (see page 3 of this decision). Acorn contends that the clearing work was in connection with building a driveway for which, it asserts, no planning and zoning permission is needed. A review of the site plan (ROR Item 18, Exhibit A) indicates that the purported "driveway" is in fact 26 feet wide and designed to carry two lanes of opposing traffic which at the very least is an accessway needing approval.
Acorn also points out that the Brookfield Planning Zoning Commission had requested clearing at the site. This is confirmed by the minutes of the Planning and Zoning Commission meeting of May 20, 2000 (ROR Item 4) and by the testimony of Richard Miller, chair of the Planning Commission (Tr. p. 19, ROR Item 19). However, it appears that the clearing requested by planning and zoning was considerably less than what was actually undertaken and completed. (ROR Item 5; Tr. p. 19.)
The court finds that there is substantial evidence in the record to support the Commission's determination to uphold the cease and desist CT Page 3504 order. Clearly, Acorn was performing regulated activities without having the requisite planning and zoning permit in violation of General Statutes § 22a-42a(d)(1), and it also proceeded, purportedly under Permit 89-38, without meeting the pre-conditions set out in that permit.
 C VALIDITY OF ORDER
Acorn has also attacked the validity of the initial issuance of the cease and desist order pointing out that the Commission Chairman, Ernesto Nepomuceno, signed the order, putting himself in the words of Acorn's brief, in the position of being "the policeman, the prosecutor and the judge" in Acorn's case. (Acorn Brief, p. 23.) The short answer to the contention is that General Statutes § 22a-44 (a) expressly authorizes either the Commission or its duly authorized agent to issue a cease and desist order. Additionally, it is well recognized that an administrative agency such as the Commission may often exercise investigative and enforcement powers along with its responsibility for the adjudication of disputes. Our Supreme Court (and many other courts) have said that this is not, in and of itself, a violation of due process. New EnglandRehabilitation Hospital of Hartford, Inc. v. Commission on Hospitals andHealth Care, 226 Conn. 105, 152 (1993).
For the foregoing reasons, the appeal is dismissed.
Adams, J.