CITY OF BRIDGEPORT *v.* TOWN OF STRATFORD (4061)

CITY OF BRIDGEPORT *v.* TOWN OF STRATFORD (4062)

CITY OF BRIDGEPORT *v.* TOWN OF STRATFORD (4063)

INGLIS, C. J., O'SULLIVAN, WYNNE, DALY and PHILLIPS, Js.

Argued June 10—decided July 29, 1955

*Edward Butler,* with whom was *Henry J. Lyons,* for the appellant (defendant).

*John V. Donnelly,* for the appellee (plaintiff).

O'SULLIVAN, J. The plaintiff city instituted the above-captioned cases for the purpose of challeng-

ing the validity of certain taxes laid by the defendant town against real and personal property owned and used by the plaintiff in connection with the operation of its municipal airport, which lies within the territorial limits of the defendant. Case No. 4061 was directed against the tax laid in 1951; case No. 4062 against that of 1950; and case No. 4063 against those of 1946 to 1949, inclusive. The actions were brought under the authority of General Statutes, § 1801, the pertinent part of which is set forth in the footnote,[1] and in each instance the plaintiff alleged, as the cause for relief, that the property was exempt from taxation. The court rendered judgment for the plaintiff as to the taxes laid in 1949, 1950 and 1951, but for the defendant as to the taxes laid in 1946, 1947 and 1948, the ruling as to these being that the plaintiff could not question their validity since it had failed to bring actions attacking them within the time limitation imposed by § 1801. Whether that ruling was correct we need not determine, since the only appeals before us were taken by the defendant and are concerned solely with the judgments as they determined the invalidity of the taxes laid in 1949, 1950 and 1951.

The finding is not subject to correction. It recites the following facts: During 1928, a private corporation acquired a substantial tract of land in

[1] "Sec. 1801. REMEDY WHEN PROPERTY WRONGFULLY ASSESSED. When it shall be claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set, . . . the owner thereof, prior to the payment of such tax, may, in addition to the other remedies provided by law, make application for relief to the court of common pleas of the county in which such town or city is situated. Such application may be made within one year from the date as of which the property was last evaluated for purposes of taxation . . . . In all such actions, the court of common pleas shall have power to grant such relief upon such terms and in such manner and form as shall to justice and equity appertain . . . ."

the town of Stratford and on it constructed and thereafter ran an airport. In 1937 the airport had deteriorated and become unusable except by small aircraft. During a part of that year it was entirely closed to air traffic. For a number of years before 1937, business and industrial interests had urged the plaintiff to buy the airport in order to provide adequate air service for Bridgeport and surrounding towns. The plaintiff finally yielded to the urging and in May, 1937, bought the airport for $115,000. At that time it had an area of approximately 260 acres and consisted of an airfield located on the westerly side of Main Street in Stratford and a seaplane channel of 10.35 acres located on the opposite side of Main Street and extending therefrom to the Housatonic River. Immediately after buying the property, the plaintiff proceeded to improve it and to enlarge its facilities. This was done largely in conjunction with the Works Progress Administration. Three runways, each 3700 feet long and 400 feet wide, were built. A large addition was made to one of the hangars, the administration building was renovated, and a restaurant, known as Happy Landing Inn, was completely overhauled and re-equipped. The cost of these improvements was $112,000 to the plaintiff and $1,225,000 to the federal government.

On December 8, 1941, the United States air force seized the airport, and it was thereafter maintained by the armed forces as a part of national defense. During the period of seizure, the airport, at great expense to the United States, was substantially enlarged by the acquisition of additional land and was improved by adding 1000 feet to the runways and by the erection of hangars and other buildings. On June 7, 1946, the federal government turned the property

back to the plaintiff. The latter thereupon resumed control of everything except two test hangars which the government had erected; it continued to remain in possession of these until September 30, 1949. On February 3, 1949, the government conveyed to the plaintiff without cost all of the property acquired during the period of federal occupation. This grant was by deed and was made subject to the condition that the property was to be used only for airport purposes. The plaintiff has since maintained the property, now consisting of 370 acres, as an airport.

Prior to October 1, 1946, the defendant laid no tax against the plaintiff by reason of its ownership of the property in question. Beginning, however, with the tax list of 1946, as to the realty comprising the airport, and with the list of 1949, as to the personalty located thereon, the defendant has laid taxes against the plaintiff in a steadily increasing amount, until the tax on the list of 1951 reached almost $43,000.[2] Other facts will be stated in the discussion of the specific problems presented by the appeals.

The plaintiff contends that its property in Stratford is exempt from taxation by virtue of General Statutes, § 1753, quoted in full in the footnote.[3] The

---

[2] The taxes levied against the plaintiff were as follows: $4390.96 on list of 1946; $4861.82 on list of 1947; $5116.70 on list of 1948; $34,446.24 on list of 1949; $39,088.34 on list of 1950; $42,772.94 on list of 1951.

[3] "Sec. 1753. MUNICIPAL AIRPORTS LOCATED IN ANOTHER TOWN. All property owned by any town or city, which is located in another town and used for the purposes of an airport, shall be exempt from taxation so long as it shall continue to be used for such purposes and so long as the town in which it is located shall have the same privileges as to the use of such airport as are possessed by the municipality owning the same; but, if any such airport shall be leased to any person, association or private corporation, or shall be used in such

fundamental issue presented by the appeals is whether the trial court was correct in agreeing with that contention.

Section 1753 exempts a town or city from taxation upon real and personal property located in another town and used for an airport. The exemption thus granted is made available as long as, first, the town or city owning the property continues to use it for airport purposes and, second, the town in which it lies has the same privileges in using the airport as the municipality owning it. So far as this portion of the statute is concerned, the plaintiff obviously qualifies for the tax exemption, and no claim to the contrary is made by the defendant.

The statute then proceeds to enumerate two conditions, the existence of either of which destroys the exemption and subjects the property to taxation. The first is that the airport may not be leased to any person, association or private corporation. This condition is not applicable to the case at bar. The other condition is that the airport shall not be used "in such manner as to become a source of profit to the municipality owning the same." It is this condition which serves the defendant's real contention. To point it up as well as to meet it, we refer to certain unchallenged findings of the court. The findings establish these facts: A restaurant is located at the airport and is under the management and control of the plaintiff's park department. The annual expenditures made in operating the restaurant have always exceeded the income derived from it. Apart from the restaurant, for the fiscal years, ending March 31, which are involved in these appeals, the receipts

manner as to become a source of profit to the municipality owning the same, the land so occupied and situated in any adjoining town or towns shall thereupon be subject to taxation."

from all airport operations and the expenditures made for the airport, its operation and maintenance, were these:

For 1948-1949

| | | |
|---|---|---|
| Expenditures | ................ | $ 83,158.98 |
| Receipts | .................... | 35,946.94 |
| Deficit | ................... | 47,212.04 |

For 1949-1950

| | | |
|---|---|---|
| Expenditures | ................ | 146,896.89 |
| Receipts | .................... | 58,392.98 |
| Deficit | ................... | 88,503.91 |

For 1950-1951

| | | |
|---|---|---|
| Expenditures | ............... | 112,772.47 |
| Receipts | .................... | 64,644.73 |
| Deficit | ................... | 48,127.74 |

The defendant challenges the force and validity of these figures because, it contends, they are not the result of approved methods of accounting. The specific criticism is that the expenditures for capital outlays are not spread over the years of useful life of the permanent improvements but are allocated only to the fiscal year in which payment was made. In other words, the defendant objects to the determination of profit at the airport on the receipts-disbursement basis which the plaintiff has adopted. That the accrual approach rather than the cash method achieves a more objective and scientific result cannot, in all probability, be successfully gainsaid. For this reason it is usually held in higher repute among accountants. Shugerman, Accounting for Lawyers, p. 152. But we are here dealing with

a municipal corporation whose powers and duties are not determined by the opinion of accountants, valuable as that opinion might be in other fields, but are both prescribed and circumscribed by the General Assembly. It would be of no moment that the accrual approach would produce a more accurate profit and loss statement of operations at the Bridgeport airport, if it should appear that the General Assembly has required the plaintiff to follow the cash method. That method, as it applies to municipal corporations, has not been without its champions. Oakey, Principles of Government Accounting & Reporting, p. 395 et seq.; see *Newport News* v. *Warwick County,* 159 Va. 571, 595, 166 S.E. 570. We call attention to this because it might be possible under the legislative requirements set forth in the Bridgeport charter to justify the practice observed by the plaintiff with respect to capital outlays. Bridgeport Charter, §§ 83, 95 (1939). We do not, however, rest our decision on that ground but prefer to rely on two other reasons in support of the judgments of the trial court.

The defendant has devoted a considerable part of its brief to a competent discussion of accountancy and of the methods of capitalizing and depreciating assets. But this is largely beside the point and it must give way to the decisive problem presented by the appeals. That problem is to construe § 1753 of the General Statutes. "A statute is to be so construed as to carry out the intent of the legislature, this to be ascertained from the Act itself, if the language is plain, otherwise by considering it in the light of all its provisions, the object sought to be accomplished, pre-existing legislation upon the same subject, and other relevant circumstances. *Hazzard* v. *Gallucci,* 89 Conn. 196, 198, 93 Atl. 230."

*Stamford* v. *Stamford,* 107 Conn. 596, 605, 141 A. 891.

The policy of the state has been to foster aviation and, as a means of attaining this objective, to encourage the development and maintenance of municipal airports.[4] This policy finds expression in many legislative enactments, of which chapter 245 of the General Statutes, covering §§ 4782 to 4845, inclusive, is outstanding. This chapter covers a vast range in the field of aeronautics and cannot be examined in detail. Suffice it to say that § 4785 vests the state aeronautics commission with general supervision over aeronautics and directs it "to encourage, foster and assist in the development of aeronautics in this state and to encourage the establishment of airports and other aeronautical facilities." The same directive is expressed again in § 4786. In furtherance of the legislative policy, § 4824 empowers the state or any municipality to establish, maintain and operate airports and to condemn land for those purposes. Sections 4825 and 4826 recognize the heavy financial burden which the construction and the maintenance of an airport impose upon any municipality, and authority is therefore granted to seek and obtain federal aid in furtherance of such projects. In addition to the foregoing, § 1753 grants an exemption from taxation to a town or city whose airport lies in another town.

These enactments speak eloquently of an aggressive legislative policy. The General Assembly deemed it essential to the progress and prosperity of the state that facilities be provided for air commerce. It is not reasonable to believe that, after providing these aids in furtherance of aviation, the

---

[4] Connecticut was the first of the states in the Union to enact legislation on aeronautics. Public Acts 1911, c. 86.

General Assembly intended to penalize, and through penalizing to make more difficult the task of, a municipality operating an airport, by withdrawing the helpful exemption from taxation if operations at its airport, located in another town, should fortuitously result in a profit in any one year. Considering the history of the legislation and the policy of the legislature towards aeronautics, we are satisfied that the provision in § 1753 that exemption from taxation would be lost if a town's airport located in another town "shall be used in such manner as to become a source of profit to the municipality owning the same" should not be construed, as the defendant contends, as meaning that the existence or absence of a profit in operations must be determined annually, and that if a profit, no matter how insignificant, has resulted in any fiscal year, the airport is thereby subjected to taxation for that year. The legislature having encouraged municipalities to assume the heavy financial burden entailed in opening and maintaining an airport, it would be absurd to make the mere existence of a profit a cause for denying a tax exemption which might be sorely needed if operations were to continue.

The construction which the defendant urges upon us would lead to possible bizarre results. If, for example, operations at the airport for 1951 had revealed a profit of one dollar, the defendant would have the plaintiff lose its exemption from taxation and pay to the defendant a tax of $42,772.94. Stated somewhat differently, the making of an insignificant profit of $1 would compel the plaintiff to pay the staggering tax of almost $43,000. The very statement of this possibility reveals the weakness of the defendant's position. It is to be presumed that the General Assembly did not intend to work an absurd

consequence. *Gallagher* v. *New York & N.E.R. Co.,* 57 Conn. 442, 445, 18 A. 786.[5] When a statute is ambiguous in terms and fairly susceptible to two constructions, one of which will avoid an absurd or ridiculous consequence, a court is warranted in assuming that the legislative intent was to attain a rational and sensible result. *Sage-Allen Co.* v. *Wheeler,* 119 Conn. 667, 679, 179 A. 195; *United States* v. *Bryan,* 339 U.S. 323, 338, 70 S. Ct. 724, 94 L. Ed. 884. The loss of the tax exemption will not occur merely because a nice calculation by this or that method of accounting discloses a profit from operations for the year. The exemption will become unavailable if, considering all the circumstances, it is obvious that the airport is being operated for the purpose of making money for the city of Bridgeport. The airport cannot be used under a plan to add revenue to the plaintiff's general treasury without suffering the consequence of losing the tax exemption. Since there is absolutely nothing in the finding to indicate that the plaintiff was operating the airport for such a purpose, its property in Stratford cannot be subjected to taxation.

But the defendant would not be advantaged, even if we accepted its interpretation of § 1753, since it can be demonstrated that whichever method, cash or accrual, is utilized, no profit from operations during

[5] An instance of absurdity avoided by proper construction is the judgment mentioned by Pufendorf that the Bolognian law stating "that whoever drew blood in the streets should be punished with the utmost severity" did not extend to the surgeon who opened the vein of a person while lying in a fit in the street. Another is the ruling, cited by Plowden, that the statute of 1 Edw. 2, stat. 2, reciting that a prisoner who breaks out of prison shall be guilty of a felony, did not apply to a prisoner who broke out when the prison was on fire, "for he is not to be hanged because he would not stay to be burnt." See *United States* v. *Kirby,* 74 U.S. (7 Wall.) 482, 487, 19 L. Ed. 278.

any of the years involved in these appeals would be shown. Concededly no profit is shown from the cash method. The same result would obtain on the basis of the accrual method. For the fact is that the loss from operations in 1949, 1950 and 1951 was so large that there would still be a deficit if capital expenditures were entirely eliminated from the computations. The total revenues, the accuracy and allocation of which are not challenged, and the expenditures, as shown in the footnote, will establish this.[6] Thus capital expenditures for 1949 amounted to $31,931.46, while the deficit was $47,212.04. Completely ignoring the former, the operations would nevertheless result in a loss of $15,280.58. Similar consequences would follow for the years 1950 and 1951. The plaintiff did not lose its right to an exemption from taxation during the years in question.

One other matter requires comment. The defendant claims that the seaplane channel should be sub-

---

[6] Fiscal year ending March 31, 1949

| | | |
|---|---:|---:|
| Total Revenues | | $ 35,946.94 |
| Expenditures | | |
| Capital improvements | 31,931.46 | |
| All others | 51,227.52 | 83,158.98 |
| Deficit | | 47,212.04 |

Fiscal year ending March 31, 1950

| | | |
|---|---:|---:|
| Total Revenues | | 58,392.98 |
| Expenditures | | |
| Capital improvements | 64,476.00 | |
| All others | 82,420.89 | 146,896.89 |
| Deficit | | 88,503.91 |

Fiscal year ending March 31, 1951

| | | |
|---|---:|---:|
| Total Revenues | | 64,644.73 |
| Expenditures | | |
| Capital improvements | 11,710.00 | |
| All others | 101,062.47 | 112,772.47 |
| Deficit | | 48,127.74 |

jected to taxation because, it maintains, the channel has never been used for the purpose for which it was dredged. In its answers, the defendant admitted the truth of allegations in the several complaints that the property owned by the plaintiff in the town of Stratford had been "used by the plaintiff as and for the purpose of an airport." These were judicial admissions and conclusive upon the defendant. *Lesser* v. *Smith*, 115 Conn. 86, 90, 160 A. 302; *Kanopka* v. *Kanopka,* 113 Conn. 30, 38, 154 A. 144.

There is no error.

In this opinion the other judges concurred.