## CITY OF NEW HAVEN *v.* TOWN OF EAST HAVEN*

Superior Court, Judicial District of New Haven—File No. CV99-0429472

Memorandum filed December 17, 2001

* Affirmed. *New Haven* v. *East Haven*, 263 Conn. 108, 818 A.2d 741 (2003).

*Corporation counsel of the city of New Haven* and *Martin Echter*, for the named plaintiff.

*Updike, Kelly & Spellacy*, for the counterclaim defendant Tweed-New Haven Airport Authority.

*Lynch, Traub, Keefe & Errante*, for the defendant.

## I

HON. JOHN T. DOWNEY, JUDGE TRIAL REFEREE. The plaintiff, the city of New Haven (New Haven), appeals the action of the defendant, the town of East Haven (East Haven), in seeking to impose taxes on certain properties owned by New Haven and located in East Haven.[1] East Haven has denied all material allegations and, in turn, has filed its revised counterclaim as against New Haven and the Tweed-New Haven Airport Authority (authority). East Haven's revised counterclaim is in three counts: the first count alleges breach of contract by New Haven; the second count alleges tortious interference with a contractual relationship by the authority; and, the third count seeks a declaratory judgment as to the rights, duties and obligations of the parties pursuant to General Statutes § 15-120g et seq. The authority appeared and participated as counterclaim defendant as to the second count. Both counterclaim defendants answered, denying all material allegations and New Haven filed its first special defense, claiming East Haven had breached a certain agreement

---

[1] New Haven withdrew the second count of its complaint, alleging that the valuation placed on the subject properties by East Haven was excessive, on February 20, 2001.

between New Haven and East Haven entered into in 1983. East Haven filed its reply and the pleadings were closed. A hearing on the complaint and counterclaim opened on February 6, 2001, continued on February 7, February 13, February 20, May 21 and May 22, 2001, when, the parties having rested, the matter was continued for briefing.

II

For many years New Haven owned and operated an airport providing air passenger and general aviation service. The airport, known as Tweed-New Haven Airport (airport), is regulated by the Federal Aviation Administration (FAA). The land devoted to airport use (airport property) is owned by New Haven but part of such land, slightly over 50 percent, is located in East Haven. Issues concerning the airport and its use have, over the years, been productive of considerable discord and litigation between East Haven and New Haven. See, e.g., *New Haven* v. *East Haven*, 177 Conn. 749, 419 A.2d 349 (1979); *East Haven* v. *New Haven*, 159 Conn. 453, 271 A.2d 110 (1970); *New Haven* v. *East Haven*, 35 Conn. Sup. 157, 402 A.2d 345 (1977). In 1983, New Haven and East Haven entered into an "Agreement between the City of New Haven and the Town of East Haven Regarding the Tweed-New Haven Airport and Related Matters" (1983 agreement) resolving certain issues relating to the airport and to the East Haven Industrial Park and imposing certain obligations on the parties.

Section 2, subsection 204 of the 1983 agreement reads: "Pursuant to [General Statutes § 12-74] buildings, structures, and property owned by [New Haven], which are used for the purposes of the Airport and are within the boundaries of the Airport and also within the boundaries of [East Haven], shall not be taxed by [East Haven]."

Section 4, subsection 402 reads in pertinent part: "This Agreement shall automatically terminate in the event that . . . (2) [a] special airport district is provided for under general or special laws, including, but not limited to, a metropolitan district or a special services district, and [New Haven] and [East Haven adopt] such a law, if required. . . ."

By 1996, New Haven's administration, led by the mayor, sought the creation of an airport authority to operate, maintain and improve the airport. Public Acts 1997, No. 97-271, effective July 1, 1997, The Tweed-New Haven Airport Authority Act (act) (now codified as General Statutes §§ 15-20g to 15-120o inclusive), established the authority. Among the statutes' provisions was General Statutes § 15-120j (b), which provides: "The authority shall have full control of the operation and management of the airport, including land, buildings and easements by means of a lease to the authority by the city of New Haven and the town of East Haven."

Subsequent to the passage of the act, the authority entered into negotiations with New Haven and East Haven. Initially, the authority sought a single agreement among the three parties; then the authority sought separate agreements, between itself and New Haven and between itself and East Haven. In its review of the draft lease agreement, the FAA advised that "Participation in the Lease and Operating Agreement should be limited to the existing owner, the City of New Haven and the Airport Authority. The Town of East Haven's interest can be protected under a separate agreement." Ultimately, the authority concluded it need not enter into a lease with East Haven because East Haven "had nothing to lease." On July 1, 1998, New Haven and the authority entered into a lease and operating agreement entitled the "Lease and Operating Agreement By and Between the City of New Haven and Tweed-New Haven Airport

Authority" (lease). East Haven was not a party to this agreement and it is undisputed that the authority has not entered into a lease with East Haven.

Subsequent to the entry into effect of the July 1, 1998 lease between New Haven and the authority, East Haven notified New Haven of its intent to tax six properties, owned by New Haven, located in East Haven and used for airport purposes. These properties are: 3 Thompson Avenue; 20 Thompson Avenue; 317 Dodge Avenue; 325 Dodge Avenue; 340 Dodge Avenue; and 10 Holmes Street. This appeal followed.

III

THE COMPLAINT

New Haven claims the subject properties are exempt from taxation by virtue of the provisions of General Statutes §§ 12-81 (4), 12-74 and § 2, subsection 204 of the 1983 agreement between New Haven and East Haven.

Section 12-81 (4) provides in pertinent part that "[e]xcept as otherwise provided by law, property belonging to, or held in trust for, a municipal corporation of this state and used for a public purpose" is exempt from taxation. East Haven acknowledges that the properties at issue would be exempt from taxation pursuant to § 12-81 (4) unless one of the three exceptions to tax exemption listed in § 12-74 applies. In fact, claims East Haven, all three exceptions apply here. As to subsection 204 of the 1983 agreement, East Haven claims the 1983 agreement and its provisions terminated automatically, pursuant to subsection 402 (2) when the authority was established by statute, and, accordingly, East Haven has no contractual obligations under § 2, subsection 204 of the aforementioned 1983 agreement.

General Statutes § 12-74 provides: "All property owned by any town or city, which is located in another town and used for the purposes of an airport, shall be exempt from taxation so long as it continues to be used for such purposes and so long as the town in which it is located has the same privileges as to the use of such airport as are possessed by the municipality owning the same; but, if any such airport is leased to any person, association or private corporation, or is used in such manner as to become a source of profit to the municipality owning the same, the land so occupied and situated in any adjoining town or towns shall thereupon be subject to taxation." Thus, the airport land in question is exempt from taxation unless: (1) East Haven no longer has the same privileges as to the use of the airport as does New Haven; (2) the lease to the authority constitutes a lease to a person, association or private corporation; or (3) the airport is used by New Haven in such a manner as to become a source of profit to the city. East Haven maintains that all three exceptions apply here and the subject properties are, accordingly, not tax-exempt.

"[T]o ascertain the intention of the legislature with respect to a tax exemption, we employ three overlapping presumptions. First, statutes that provide exemptions from taxation are a matter of legislative grace that must be strictly construed against the taxpayer. Second, any ambiguity in the statutory formulation of an exemption must be resolved against the taxpayer. Third, the taxpayer must bear the burden of proving the error in an adverse assessment concerning an exemption." *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 690. Section 12-74, however, "does not grant an exemption in the technical sense. Rather it merely states a rule of nontaxability. Consequently, it does not come within the rule that tax exemption statutes must be construed strictly against the

taxpayer." (Internal quotation marks omitted.) *Stratford* v. *Bridgeport*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 2044584 (September 16, 1996) (*Levin, J.*). Nonetheless, New Haven, as the taxpayer in the present case, bears the burden to prove its tax-exempt status.

## A

As to privileges as to the use of the airport, New Haven defines "use" to mean utilization of the airport facility for transportation purposes, and claims East Haven and its residents have the same privileges as to use of the airport as does New Haven and its residents. A review of East Haven's arguments indicates it defines "use" more expansively. East Haven cites a number of rights and benefits it claims it enjoyed under the 1983 agreement; claiming that agreement is terminated and, absent a lease between the authority and East Haven, East Haven argues, New Haven enjoys greater privileges as to the use of the airport than does East Haven. The court finds that the phrase "privileges as to the use of such airport," as used in § 12-74, has reference to use by a town or city of the aforementioned airport for air transportation purposes.

East Haven claims the 1983 agreement terminated automatically upon creation of the authority by virtue of Public Acts 1997, No. 97-271, resulting in the loss to East Haven of certain contractual rights. Meanwhile, New Haven obtained certain rights by virtue of its lease with the authority. The end result, says East Haven, is that New Haven enjoys greater privileges as to the use of the airport than does East Haven. The court is not persuaded. An examination of each of the rights asserted by East Haven reveals no such rights which may fairly be said to constitute a privilege as to use of the airport.

East Haven cites a right of "first refusal" granted it by § 4, subsection 402 (3) of the 1983 agreement. Subsection 402 (3) states that the 1983 agreement shall automatically terminate in the event that: "The municipalities agree to permanently close the Airport and to reuse the lands within the Airport boundaries for other than Airport use. In the event that the Airport is permanently closed, the lands within [East Haven's] municipal boundaries shall no longer be considered in public use and will be subject to all land use regulations of [East Haven]. [East Haven] will have, in that event, the option of first refusal to purchase the lands from [New Haven]." Clearly, these provisions do not address use of the airport, but rather reuse of lands within airport boundaries should the airport be permanently closed. The court notes that the authority could not grant such option of first refusal to East Haven in any event, as the airport property is owned by New Haven.

East Haven claims that under the 1983 agreement it had "veto power" over changes to the master use plan. In the lease between New Haven and the authority, New Haven has such veto power while East Haven does not. East Haven, therefore, says that New Haven has greater privileges as to the use of the airport than does East Haven.

The court is not persuaded. The "veto power" in question has to do with plans for expansion and improvement of the airport, not with use by the municipalities of the airport for air transportation purposes.

East Haven claims that whereas, under the 1983 agreement, East Haven held two of nine seats on the board of airport commissioners, it now holds two of fourteen seats on the authority's board of directors. This "dilution," says East Haven, means New Haven has greater privileges as to use of the airport than does East Haven.

Again, the court is not persuaded. Membership on the airport's board is a question of governance and does not have reference to use by municipalities of the airport for air transportation purposes.

Finally, the fact that East Haven is not a signatory to the lease between the authority and New Haven does not affect East Haven's privileges as to the use of the airport for air transportation purposes.

The court finds that the lease between New Haven and the authority affords New Haven no privileges as to the use of the airport that East Haven does not enjoy equally. The court finds that East Haven enjoys the same privileges as to the use of the airport as does New Haven.

B

East Haven claims that New Haven has failed to prove that the authority does not constitute a person, association or private corporation.

General Statutes § 1-1 (k) provides that: "The words 'person' and 'another' may extend and be applied to communities, companies, corporations, public or private, limited liability companies, societies and associations." Our task "is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Nichols* v. *Lighthouse Restaurant, Inc.*, 246 Conn. 156, 165, 716 A.2d 71 (1998); *Board of Education* v. *East Haven Education Assn.*, 66 Conn. App. 202, 206–207, 784 A.2d 958 (2001). Under the terms of General Statutes § 15-120i, the authority is "a body politic and corporate" and "a public instrumentality and political subdivision of this state"; its exercise of the powers conferred upon it is "the performance of an essential public and governmental function." Clearly,

such an entity is neither an "association" nor a "private corporation." Did the legislature, however, intend that the term "person," as used in § 12-74, encompass such public instrumentality and political subdivision of the state? This court answers, "No."

While "person" may be construed to include, inter alia, private corporations and associations, there would be no purpose in enumerating these latter two categories had the legislature intended that the term "person," as used in § 12-74 was to be read so expansively as to cover the categories enumerated in § 1-1 (k). The legislature is presumed to have had a rational purpose in establishing an exception if an airport is leased to "any person, association or private corporation." If "person" is construed expansively, so as to include "association" and "private corporation," then these terms, "association" and "private corporation," as used in § 12-74, are superfluous. "[S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) *Zoning Board of Appeals* v. *Freedom of Information Commission*, 66 Conn. App. 279, 285, 784 A.2d 383 (2001). The court concludes that "person," as used in § 12-74, was used in its restrictive meaning, that is, as connoting a natural person, an individual human being. "[U]nless there is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive." (Internal quotation marks omitted.) *Zachs* v. *Groppo*, 207 Conn. 683, 693, 542 A.2d 1185 (1988). The court construes the list of lessees triggering the exception to be exclusive, not illustrative. The legislature was free to but did not list other entities, a lease to which would trigger the exception. The court finds that the authority is neither a person, an association nor a private corporation, as these terms are used in § 12-74.

## C

East Haven claims that the properties at issue are subject to taxation because, under the terms of the agreement between New Haven and the authority, the airport is being "used in such manner as to become a source of profit to the municipality owning the same." New Haven insists that the airport is not being so used. Both New Haven and East Haven cite *Bridgeport v.* *Stratford,* 142 Conn. 634, 116 A.2d 508 (1955), and both seem to agree that our Supreme Court holds inter alia, that the exemption is triggered, not from a calculation that an airport shows a profit in a given year, but, rather, "if, considering all the circumstances, it is obvious that the airport is being operated for the purpose of making money for the city . . . ." Id., 644.

In support of its claim, East Haven presented the testimony of two experts, Steven Shapiro, an economist and chairman of the department of economics and finance at the University of New Haven and Michael D'Addio, an attorney and tax consultant. Both witnesses testified that the lease between New Haven and the authority evidenced an intent on the part of New Haven to make a profit.

Shapiro based his conclusion on provisions of the lease limiting New Haven's operating and capital contributions to the airport operation, and, commencing in 2003, eliminating subsidies by New Haven. Thus, by terms of the lease, New Haven caps its future losses. Moreover, the lease terms provide for repayment by the authority to New Haven of the latter's contributions, with interest. Shapiro also cited the "reverter" clause in the lease whereby, should the lease expire, all of the airport's assets would revert to New Haven. All this, Shapiro concludes, evidences New Haven's intent to make a profit.

D'Addio also concludes the lease evidences an intent by New Haven to make a profit. D'Addio focused on income projections made by the authors of "The Emerging Blueprint: Tweed-New Haven Regional Airport," a statement of goals and objectives for the first fifteen years of its operation issued by the authority. D'Addio focuses specifically on a chart appearing on page twenty-two, projecting annual operating results. Basing his calculations on these projections D'Addio projects an expected profit of some $138,000,000 over the term of the lease. Since there is no guaranteed lease extension, these moneys, as well as any other airport assets must someday return to New Haven, claims D'Addio. Thus, D'Addio concludes, New Haven intends to operate the airport as a source of profit.

The court is not persuaded. First, East Haven's experts never define "profit"; this allows them to term any increment in value as profit. Thus, a return of assets which have appreciated in value is deemed a profit. A repayment, with interest, of subsidies is deemed a profit. An operating surplus is deemed a profit. In a similar context, our Supreme Court indicated its understanding of "profit" as used in General Statutes § 12-74: "The airport cannot be used under a plan to add revenue to the plaintiff's general treasury without suffering the consequence of losing the tax exemption." *Bridgeport* v. *Stratford*, supra, 142 Conn. 644. This court concludes that any operating surplus, applied to operation, maintenance or improvement of the airport, cannot be deemed profit as that term is used in § 12-74.

East Haven ignores the contingent nature of the repayment clauses. Under terms of the lease, the authority is not obligated to repay New Haven for New Haven's contributions unless certain events occur. The authority's repayment obligations are also strictly limited in time and amount. East Haven ignores the requirement imposed by the regulating authority, the FAA, that any

operating surplus must be used for airport improvements.

D'Addio's reliance on the "blueprint" is misplaced. The blueprint forms no part of the lease and was not adopted by either the authority or New Haven as binding on either party. D'Addio also ignores the footnote to the aforementioned chart, which reads: "Any operating surplus will be applied to infrastructure improvements approved and authorized by the [authority] and the [FAA]." Moreover, D'Addio's characterization of the projection as showing a profit of $138 million is unconvincing. The aforementioned chart is simply too flimsy a basis on which to rest such a conclusion.

New Haven correctly points out that an operating surplus does not necessarily constitute a profit. It points out that the FAA requires that any surplus revenue earned must be devoted to capital and operating expenses of the airport; that, in fact, the airport has been operated for many years at a deficit and that the provisions of the lease at issue do not allow for the full recovery by New Haven of such deficits; that the provisions of the lease do not require the authority to reimburse New Haven for the deficits incurred; that such payments by the authority, contingent in nature, are capped; that the reversion of airport assets to New Haven, a contingency, would not constitute profit; that New Haven's capping its losses does not constitute profit.

Pursuant to article III, § 3.2 of the lease, New Haven and the authority agree that in the period from July 1, 1992, through June 30, 1998, New Haven has contributed to the airport over four million dollars and that New Haven will further contribute moneys during the transfer period from July 1, 1998 through June 30, 2003, which, with interest, makes a maximum contribution of over eleven million dollars. Pursuant to the lease,

the authority undertakes to commence repayment of these moneys after July 1, 2003, in equal monthly installments, but the monthly repayment is capped at $50,000, and "no compensation shall be paid to [New Haven] unless the [a]uthority has sufficient funds to make such payment and to operate the airport and maintain a reasonable reserve for necessary operating and/or capital expenditures." Such contingency provisions for repayment of subsidies cannot reasonably be construed as evidencing the purpose of making a profit for New Haven. East Haven's rejoinder that no lease guarantees a profit is unpersuasive; there is a crucial distinction between an agreement whereby one party undertakes to make certain payments to another and an agreement whereby a payor's obligation to pay is contingent on the financial condition of the payor. It should be noted that, under the lease, a failure of the authority to make monthly repayments does not itself constitute a default. Similarly, the capping of New Haven's future subsidies to the airport cannot reasonably be construed as evidence of New Haven's intent to make a profit from the operation of the airport.

Section 3.5 of the lease between the authority and New Haven provides in pertinent part: "Upon the expiration or sooner termination of the Demised Term, the Authority shall give up, surrender and deliver to [New Haven] the Leased Premises, in its then condition, together with all other Airport Assets . . . ." Section 4.2 of the lease provides in pertinent part: "Upon the expiration or sooner termination of this Agreement, all of the Authority's right, title and interest in any and all Airport Assets then in existence shall immediately and automatically vest in [New Haven] . . . ." Section 3.11 of the lease gives either party the right to terminate the lease prior to January 1, 2003, under certain conditions in which event: "This Agreement shall thereupon terminate and the Leased Premises and title to the other

Airport Assets shall revert to [New Haven] . . . ." It cannot reasonably be maintained that the reverter provisions or the transfer provision of the lease evidence an intent to operate the airport as a source of profit. "A lease transfers an estate in real property to a tenant for a stated period, with a reversion in the owner after the expiration of the lease." (Internal quotation marks omitted.) *Monarch Accounting Supplies, Inc.* v. *Prezioso,* 170 Conn. 659, 663, 368 A.2d 6 (1976). The court finds the lease at issue just such a transaction, with no assurance that, should such airport assets revert to New Haven, they will have appreciated in value. The court finds that the terms of the lease regarding reverter and transfer of airport assets do not establish an intent by New Haven to operate the airport as a source of profit for New Haven.

Moreover, there is the "reverter" provision in General Statutes § 15-120i (d), whereby the rights and properties of the authority shall pass to and be vested in New Haven if the existence of the authority is terminated by law. Is one to conclude that the legislature, in including this reverter clause, intended that the airport be used in such manner as to become a source of profit to New Haven? The court thinks not. Based on the evidence presented, the court is not persuaded that the terms of the lease evidence an intent to operate the airport so as to add revenue to New Haven's general fund.

"The exemption will become unavailable if, considering all the circumstances, it is obvious that the airport is being operated for the purpose of making money for the city . . . ." *Bridgeport* v. *Stratford,* supra, 142 Conn. 644.

The court finds that the terms of the lease between the authority and New Haven evidenced no intent by New Haven to use the airport in such manner as to become a source of profit to New Haven.

The court finds that New Haven has established, by a fair preponderance of the evidence, that the properties at issue are exempt from taxation, pursuant to §§ 12-81 (4) and 12-74.

## IV

## THE REVISED COUNTERCLAIM

East Haven, in the first count of its revised counterclaim, alleges that New Haven, by entering into a lease with the authority, to the exclusion of East Haven, breached the 1983 agreement between East Haven and New Haven. Under terms of the 1983 agreement, East Haven claims it had the option of first refusal to purchase airport lands within East Haven's municipal boundaries should New Haven and East Haven agree permanently to close the airport. East Haven claims it had "veto power" over changes in the airport's Master Use Plan (master plan). By virtue of New Haven's breach East Haven claims it lost the rights enumerated and was "deprived of any meaningful input concerning the airport."

New Haven contends that, in entering into a lease with the authority, it has not breached the 1983 agreement and that the 1983 agreement has not been terminated. New Haven claims it entered the lease pursuant to statute and had no control as to whether the authority entered into a lease with East Haven.

The authority claims that the coming into effect of P.A. 97-271 did indeed automatically terminate the 1983 agreement, and that East Haven's assertion of this fact constitutes a judicial admission.

East Haven insists that the 1983 agreement terminated automatically with the passage of P.A. 97-271. If that is the case, the 1983 agreement then ceased to exist and New Haven could not have violated the 1983 agreement by reason of it entering subsequently into a lease between itself and the authority.

The court must decide, in the first instance, whether the 1983 agreement was automatically terminated by passage of P.A. 97-271. Paragraph 402 of the 1983 agreement sets out the grounds for such termination.

There are three events, any of which shall automatically terminate the 1983 agreement:

"(1) The State of Connecticut acquires and operates the Airport as a state airport; or

"(2) A special airport district is provided for under general or special laws, including, but not limited to, a metropolitan district or a special services district, and [New Haven] and [East Haven] adopts such a law, if required; or

"(3) The municipalities agree to permanently close the Airport and to reuse the lands within the Airport boundaries for other than Airport use . . . ."

There is no claim that either events (1) or (3) have occurred. It is East Haven's claim that P.A. 97-271, creating the authority, provided for a "special airport district," or its equivalent, thus automatically terminating the 1983 agreement and stripping East Haven of rights and privileges it enjoyed under that agreement.

This court has found no statutory definition of "special airport district." The drafters of the 1983 agreement offer the terms "metropolitan district" and "special services district" as illustrative of what sort of entity they had in mind, but are careful not to limit special airport district to the latter two types of entity.

Municipal special services districts are the subject of chapter 105a of the General Statutes. A municipal special services district does constitute a body politic and corporate, but a review of chapter 105a establishes that the authority was not established pursuant to that chapter. Similarly, the authority is not a district as defined by the provisions of chapter 105 of the General

Statutes entitled "Fire, Sewer and Other Districts." In particular, operation and maintenance of an airport is not among the powers enumerated in General Statutes § 7-326. General Statutes §§ 7-334 through 7-339, inclusive, govern the formation and powers of a metropolitan district and, again, the authority does not fit comfortably within this scheme; clearly, the authority is not a metropolitan district, as defined by statute. The drafters, however, in including the phrase, "including, but not limited to," clearly meant that their listing of "metropolitan district" and "special service district" was not to be read as exhaustive and that a "special airport district" could take another form. In the context of the 1983 agreement, the court concludes that, in using such term, the parties had reference to a body politic and corporate, created for the purpose of managing, maintaining and operating the airport. The court concludes that the legislature, in passing chapter 267a of the General Statutes, which is titled, the "Tweed-New Haven Airport Authority Act," effective July 1, 1997, created an equivalent of a "special airport district," as the term is used in paragraph 402 (2) of the 1983 agreement. The court concludes that, as a consequence, the 1983 agreement was automatically terminated when P.A. 97-271 took effect.

## A

### First Count

In the first count of its revised counterclaim, East Haven claims that by entering into the lease with the authority, New Haven breached the 1983 agreement. The court's finding that the 1983 agreement automatically terminated on July 1, 1997, when P.A. 97-271 took effect, is fatal to East Haven's claim. By July 1, 1998, when New Haven entered into its lease with the authority, the 1983 agreement had been terminated. There was no 1983 agreement extant between New Haven and

East Haven and, this being the case, there could be no breach of such agreement by New Haven.

The court finds that East Haven has failed to establish, by a preponderance of the evidence, that, by entering into the lease with the authority, New Haven breached its contract (the 1983 agreement with East Haven).

### B

### Second Count

In the second count of its revised counterclaim, East Haven alleges that the authority tortiously interfered with contractual relations between East Haven and New Haven by entering into a lease with New Haven that contravened the terms of the 1983 agreement between the city and the town.

The elements of tortious interference with contract rights are well established. " 'One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.' " *Selby* v. *Pelletier*, 1 Conn. App. 320, 322, 472 A.2d 1285 (1984), quoting 4 Restatement (Second), Torts § 766 (1979). "A claim for tortious interference with contractual rights requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with that relationship, (4) the interference was tortious and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Collum* v. *Chapin*, 40 Conn. App. 449, 452, 671 A.2d 1329 (1996). "[N]ot every act that disturbs a contract or business expectancy is actionable." (Internal quotation marks omitted.) *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 535–36, 546

A.2d 216 (1988). "[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . The burden is on the plaintiff to plead and prove at least some improper motive or improper means . . . ." (Citations omitted; internal quotation marks omitted.) *Solomon* v. *Aberman*, 196 Conn. 359, 365, 493 A.2d 193 (1985).

Again, the court's finding that the 1983 agreement between East Haven and New Haven had automatically terminated by the time the latter entered into its lease with the authority is fatal to East Haven's claim. Absent such contract, there can be no tortious interference with contractual relations by the authority.

The court finds that East Haven has failed to establish, by a fair preponderance of the evidence, its claim that the authority tortiously interfered with contractual relations between East Haven and New Haven.

V

The court notes that the "losses and damages" which East Haven claims it suffered as a result of New Haven's entering into a lease with the authority include the following.

First, New Haven unilaterally appropriated East Haven's right of first refusal as to the airport property located in East Haven.

Section 4, subsection 402 of the 1983 agreement provides that the 1983 agreement automatically terminates in the event that: "The municipalities agree to permanently close the Airport and to reuse the lands within the Airport boundaries for other than Airport use. In the event that the airport is permanently closed, the lands within [East Haven's] municipal boundaries shall

no longer be considered in public use and will be subject to all land use regulations of [East Haven]. [East Haven] will have, in that event, the option of first refusal to purchase the land from [New Haven]."

The 1983 agreement automatically terminated by virtue of the enactment of P.A. 97-271, establishing the authority. This legislative action cannot be termed a breach of contract by New Haven.

The court notes that the authority has no power to negotiate or agree to any such right of first refusal which could only come into effect after the authority ceased to function.

East Haven's representation on the airport's oversight body and East Haven's ability to make meaningful decisions, have been "diluted" in that, under the 1983 agreement, East Haven held two seats of nine on the board of airport commissioners, whereas, under P.A. 97-271, East Haven holds two seats of a total of fourteen on the authority's board. It is true that East Haven's representation has been reduced proportionately. This, however, is by virtue of an act by the legislature, and cannot be deemed a breach of contract by New Haven nor the result of tortious interference by the authority. It is beyond the power of New Haven or the authority to alter the representation fixed by statute. If East Haven wishes to alter its representation, it must seek its remedy in the legislature.

Third, and finally, under the 1983 agreement, East Haven claims it had "veto power" over changes to the master plan. That power, it claims, was lost by virtue of the authority's refusal to enter into a lease with East Haven.

Section 1, subsection 104 of the 1983 agreement provides: "Any modification to the [master plan] must be recommended by the [New Haven] Board of Airport

Commissioners and submitted for approval to the legislative bodies of both [New Haven] and [East Haven]. Upon approval by the legislative bodies, these modifications shall then be submitted to the State of Connecticut, Department of Transportation, and the [FAA], Airports Division." Section 1, subsection 104 did not survive the automatic termination of the 1983 agreement.

The provisions of the lease and operating agreement between the authority and New Haven relating to the airport master plan make no reference to the town of East Haven. This is not to say, however, that East Haven is devoid of a remedy should changes to the aforementioned master plan be proposed. East Haven remains free to pursue its position on proposed changes in administrative, legislative or judicial arenas. The court notes that the city claims East Haven retains its right to approve changes in the master plan under the provisions of the 1983 agreement.

East Haven clearly has a legitimate interest in the master plan and in the impact on East Haven of any proposed changes in that master plan. There are indications in the record that there are vehicles available for East Haven's assertion of its rights. See, e.g., the transmission memo dated May 27, 1998, from Jim Horan to the New Haven Board of Aldermen stating: "Any taking of land . . . could only be done by the City of New Haven (or Town of East Haven), since the Authority lacks the power of eminent domain." See also Federal Assurances, § C.5 "Preserving Rights and Powers" attached to the copy of the lease submitted into evidence by New Haven. East Haven has failed to establish that a lease to the authority by New Haven and East Haven, pursuant to § 15-120j (b), is the proper vehicle, or the sole vehicle, by which to protect such interest.

## A

### Third Count

In the third count of its revised counterclaim, East Haven seeks a declaratory judgment declaring the rights, duties and obligations of the parties pursuant to § 15-120i et seq., with particular reference to General Statutes § 15-120j (b).

Pursuant to Practice Book § 17-54, the court has the authority to render declaratory judgments as to the existence or nonexistence (1) of any right, power, privilege or immunity, or (2) of any fact upon which the existence or nonexistence of such right, power, privilege or immunity does or may depend, whether such right, power, privilege or immunity now exists or will arise in the future.

Section 15-120j (b) provides: "The authority shall have full control of the operation and management of the airport, including land, buildings and easements by means of a lease to the authority by the city of New Haven and the town of East Haven." East Haven insists that this is a statutory requirement that the authority enter into a single lease with New Haven and East Haven. East Haven claims that in the absence of such lease the authority has unlawfully taken over the control or operation of the airport. Both the authority and New Haven claim that the inclusion of East Haven in the provisions of § 15-120j (b) was an error by the legislature, a "mere inaccuracy," and ask that the court so find.

In the course of these proceedings, an underlying concern of East Haven is that certain rights and privileges, conferred upon it by the terms of the 1983 agreement, have been lost and should have been reestablished by terms of a lease among it, New Haven and the authority. As indicated previously in part V of this

memorandum of decision, the rights and privileges specified by East Haven are: (1) East Haven's "right of first refusal"; (2) East Haven's representation on the airport's oversight body, which has been diluted; and (3) East Haven's "veto power" over changes to the airport master plan. While every lease is an agreement, not every agreement is a lease. "A lease transfers an estate in real property to a tenant for a stated period, with a reversion in the owner after the expiration of the lease." *Jo-Mark Sand & Gravel Co.* v. *Pantanella,* 139 Conn. 598, 601, 96 A.2d 217 (1953). No one has claimed that the 1983 agreement was a lease. The language of § 15-120j (b)—a lease "to" the authority "by" New Haven and East Haven—makes clear that the legislature contemplated that East Haven convey to the authority whatever interest East Haven held in property utilized for the operation and management of the airport. New Haven and the authority claim East Haven possesses no such property interest. The court finds that East Haven has failed to establish it has such property interest. As one witness testified, East Haven "had nothing to lease." In reaching this conclusion, the court is not required to find that the legislature was in error in providing that the authority have full control of the operation and management of the airport "by means of a lease between the city of New Haven and the town of East Haven." General Statutes § 15-120j (b). The court reads this provision as, by necessary implication, containing the proviso, "insofar as either municipality possesses land, buildings or easements used for operation and management of the airport," or words to that effect. By including both New Haven and East Haven in the lease provision, the legislature sought to ensure that all property utilized for the operation and management of the airport be conveyed to the authority. The legislature did not intend to mandate a lease to the authority as lessee, by a nonowner of that property, as lessor, a

legal impossibility. Accordingly, the court declines to issue a declaratory judgment declaring that in the absence of a single lease by East Haven and New Haven to the authority, the authority has unlawfully taken over the control and operation of the airport.

## VI

As to the complaint, the court finds that New Haven has established, by a fair preponderance of the evidence, that the properties at issue, owned by New Haven and located in the town of East Haven, are not subject to taxation by East Haven. Accordingly, judgment on the complaint may enter in favor of New Haven as against East Haven.

As to the counterclaim, the court finds that East Haven, the plaintiff on the counterclaim, has failed to establish, by a fair preponderance of the evidence, its claims of breach of contract as against New Haven and tortious interference with a contract as against the authority and has failed to persuade the court to issue a declaratory judgment declaring that the authority has unlawfully taken over the control and operation of the airport. Judgment on the counterclaim, may, accordingly, enter in favor of the city of New Haven and the authority, the counterclaim defendants, as against the town of East Haven.