CITY OF NEW HAVEN *v.* TOWN OF EAST HAVEN
(SC 16738)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

Argued January 16—officially released April 8, 2003

*Marisa Bellair*, with whom were *Nicole M. Fournier* and, on the brief, *Hugh F. Keefe*, for the appellant (defendant).

*Thomas W. Ude, Jr.*, corporation counsel, with whom was *Amy P. Blume*, assistant corporation counsel, for the appellee (plaintiff city of New Haven).

*Hugh I. Manke*, with whom, on the brief, were *Brad N. Mondschein* and *Barbara A. Frederick*, for the appellee (plaintiff Tweed-New Haven Airport Authority).

*Opinion*

PER CURIAM. The defendant, the town of East Haven, appeals[1] from the judgment of the trial court declaring certain properties owned by the plaintiff, the city of New Haven, located within the defendant's borders and used in connection with Tweed-New Haven Airport (airport), to be tax exempt pursuant to General Statutes §§ 12-74[2] and 12-81.[3] The defendant levied taxes

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 12-74 provides: "All property owned by any town or city, which is located in another town and used for the purposes of an airport, shall be exempt from taxation so long as it continues to be used for such purposes and so long as the town in which it is located has the same privileges as to the use of such airport as are possessed by the municipality owning the same; but, if any such airport is leased to any person, association or private corporation, or is used in such manner as to become a source of profit to the municipality owning the same, the land so occupied and situated in any adjoining town or towns shall thereupon be subject to taxation."

[3] General Statutes § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation:

* * *

on the plaintiff's property located within the defendant's borders after determining that the property had lost its tax exempt status under § 12-74 upon being leased by the plaintiff to the Tweed-New Haven Airport Authority (airport authority).[4]

The defendant claims that the lease between the plaintiff and the airport authority triggered all three of the exceptions to tax exemption enumerated in § 12-74. Specifically, the defendant argues that: (1) the lease between the plaintiff and the airport authority evidenced the plaintiff's intent to utilize the airport as a source of profit; (2) by virtue of the lease, the defendant does not have the same privileges as the plaintiff with respect to the use of the airport; and (3) the airport authority constitutes a "person, association or private corporation" within the meaning of § 12-74. The defendant also claims that the trial court improperly declined to render a judgment declaring the respective rights, duties and obligations of the parties pursuant to the Tweed-New Haven Airport Authority Act, General Statutes § 15-120g et seq.[5]

"(4) Municipal property. Except as otherwise provided by law, property belonging to, or held in trust for, a municipal corporation of this state and used for a public purpose . . . ."

[4] The airport authority intervened in the present case as a party plaintiff. The airport authority was established in 1997 by the Tweed-New Haven Airport Authority Act, Public Acts 1997, No. 97-271, codified at General Statutes § 15-120g et seq.

[5] General Statutes § 15-120g provides: "Sections 15-120g to 15-120o, inclusive, shall be known and may be cited as the 'Tweed-New Haven Airport Authority Act'."

General Statutes § 15-120h provides: "As used in sections 15-120g to 15-120o, inclusive, the following terms shall have the following meanings:

"(1) 'Authority' means the Tweed-New Haven Airport Authority as created under section 15-120i;

"(2) 'Procedure' means each statement, by the authority, of general applicability, without regard to its designation, that implements or prescribes law or policy or describes the organization or procedure of the authority. The term includes the amendment or repeal of a prior regulation, but does not include, unless otherwise provided by any provision of the general statutes, (A) statements concerning only the internal management of the

"Our examination of the record and briefs and our

authority and not affecting procedures available to the public and (B) intra-authority memoranda;

"(3) 'Proposed procedure' means a proposal by the authority under the provisions of section 15-120k for a new procedure or for a change in, addition to or repeal of an existing procedure."

General Statutes § 15-120i provides: "(a) There is created a body politic and corporate to be known as the 'Tweed-New Haven Airport Authority'. Said authority shall be a public instrumentality and political subdivision of this state and the exercise by the authority of the powers conferred by sections 15-120g to 15-120o, inclusive, shall be deemed and held to be the performance of an essential public and governmental function. The Tweed-New Haven Airport Authority shall not be construed to be a department, institution or agency of the state.

"(b) The authority shall be governed by a board of directors consisting of fourteen members, each member serving not more than two consecutive four-year terms. The initial terms of the members shall be staggered so that not more than four members' terms shall expire at the same time. Nine members shall be appointed by the mayor of New Haven and two members shall be appointed by the mayor of East Haven. Not less than six members of the authority shall be residents of New Haven and East Haven. Three members of the authority shall be appointed by the South Central Regional Council of Governments which appointees shall be residents of any of the following towns or cities: Bethany, Branford, Guilford, Hamden, Madison, Milford, North Branford, North Haven, Orange, Wallingford, West Haven or Woodbridge. The board of directors shall elect a chairperson from among its members and shall annually elect one of its members as vice-chairperson and shall elect other members as officers, and establish bylaws as necessary for the operation of the authority. Members of the board of directors shall receive no compensation for the performance of their duties. No member of the board shall have any financial interest in Tweed-New Haven Airport or any of its tenants or concessions.

"(c) The powers of the authority shall be vested in and exercised by the board. Eight members of the board shall constitute a quorum and the affirmative vote of a majority of the members present at a meeting of the board shall be sufficient for any action taken by the board. No vacancy in the membership of the board shall impair the right of a quorum to exercise all the rights and perform all the duties of the board. Any action taken by the board may be authorized by resolution at any regular or special meeting and shall take effect immediately unless otherwise provided in the resolution. Notice of any meeting, whether special or regular, shall be given orally, not less than forty-eight hours prior to the meeting. The board may delegate to three or more of its members, or its officers, agents and employees, such board powers and duties as it may deem proper.

"(d) The authority shall have perpetual succession and shall adopt procedures for the conduct of its affairs in accordance with section 15-120k. Such

succession shall continue as long as the authority shall have obligations outstanding and until the existence of the authority is terminated by law at which time the rights and properties of the authority shall pass to and be vested in the city of New Haven."

General Statutes § 15-120j provides: "(a) The authority shall maintain and improve Tweed-New Haven Airport as an important economic development asset for the south central Connecticut region which is comprised of the towns and cities of Bethany, Branford, East Haven, Guilford, Hamden, Madison, Milford, New Haven, North Branford, North Haven, Orange, Wallingford, West Haven and Woodbridge. The authority shall have the following powers and duties and may exercise such powers in its own name: (1) To manage, maintain, supervise and operate Tweed-New Haven Airport; (2) do all things necessary to maintain working relationships with the state, municipalities and persons, and conduct the business of a regional airport, in accordance with applicable statutes and regulations; (3) to charge reasonable fees for the services it performs and modify, reduce or increase such fees, provided fees shall apply uniformly to all airport users; (4) to enter into contracts, leases and agreements for goods and equipment and for services with airlines, concessions, counsel, engineers, architects, private consultants and advisors; (5) to contract for the construction, reconstruction, enlargement or alteration of airport projects with private persons and firms in accordance with such terms and conditions as the authority shall determine; (6) to make plans and studies in conjunction with the Federal Aviation Administration or other state or federal agencies; (7) to apply for and receive grant funds for airport purposes; (8) to plan and enter into contracts with municipalities, the state, businesses and other entities to finance the operations and debt of the airport, including compensation to the host municipalities of New Haven and East Haven for the use of the land occupied by the airport; (9) to borrow funds for airport purposes for such consideration and upon such terms as the authority may determine to be reasonable; (10) to employ a staff necessary to carry out its functions and purposes and fix the duties, compensation and benefits of such staff; (11) to issue and sell bonds and to use the proceeds of such bonds for capital improvements to the airport; (12) to acquire property by purchase or lease for airport purposes, subject to applicable requirements of federal law and regulation; (13) to prepare and issue budgets, reports, procedures, audits and such other materials as may be necessary and desirable to its purposes; and (14) to exercise all other powers granted to such an authority by law.

"(b) The authority shall have full control of the operation and management of the airport, including land, buildings and easements by means of a lease to the authority by the city of New Haven and the town of East Haven."

General Statutes § 15-120k provides: "(a) The board of directors of the authority shall adopt written procedures, in accordance with subsections (b) and (c) of this section, for: (1) Adopting an annual budget and plan of operations, which shall include a requirement of board approval before

us that the judgment of the trial court should be

the budget or plan may take effect; (2) hiring, dismissing, promoting and compensating employees of the authority, which shall include an affirmative action policy and a requirement of board approval before a position may be created or a vacancy filled; (3) acquiring real and personal property and personal services, which shall include a requirement of board approval for any nonbudgeted expenditure in excess of five thousand dollars; (4) contracting for financial, legal, bond underwriting and other professional services which shall include a requirement that the authority solicit proposals at least once every three years for each such service which it uses; (5) issuing and retiring bonds, notes and other obligations of the authority; (6) awarding loans, grants and other financial assistance, which shall include eligibility criteria, the application process and the role played by the authority's staff and board of directors; and (7) the use of surplus funds.

"(b) Before adopting a proposed procedure, the authority shall give at least thirty days' notice by publication in the Connecticut Law Journal of its intended action. The notice shall include (1) either a statement of the terms or of the substance of the proposed procedure or a description sufficiently detailed so as to apprise persons likely to be affected of the issues and subjects involved in the proposed procedure, (2) a statement of the purposes for which the procedure is proposed and (3) when, where and how interested persons may present their views on the proposed procedure. The authority may only adopt a proposed procedure by a two-thirds vote of the full membership of its board of directors.

"(c) If the authority finds that an imminent peril to the public health, safety or welfare requires adoption of a proposed procedure upon fewer than thirty days' notice and states in writing its reasons for such finding and the authority's board of directors, by a three-fourths vote of the statutory membership, approves the finding in writing, the authority may proceed without prior notice or hearing or upon any abbreviated notice and hearing that it finds practicable, to adopt an emergency proposed procedure not later than ten days, excluding Saturdays, Sundays and holidays, prior to the proposed effective date of the proposed procedure. An approved emergency procedure may be effective for a period of not more than one hundred twenty days and renewable once for a period of not more than sixty days. If the necessary steps to adopt a permanent procedure, including publication of notice of intent to adopt, are not completed prior to the expiration date of an emergency procedure, the emergency procedure shall cease to be effective on that date."

General Statutes § 15-120*l* provides: "(a) The board of directors of the authority is authorized from time to time to issue its bonds, notes and other obligations in such principal amounts as in the opinion of the board shall be necessary to provide sufficient funds for carrying out the purposes set forth in sections 15-120g to 15-120o, inclusive, including the payment, funding or refunding of the principal of, or interest or redemption premiums on, any bonds, notes and other obligations issued by it whether the bonds, notes

## affirmed. The issues were resolved properly in the trial

or other obligations or interest to be funded or refunded have or have not become due, the establishment of reserves to secure such bonds, notes and other obligations and all other expenditures of the authority incident to and necessary or convenient to carry out the purposes set forth in said sections.

"(b) Except as otherwise expressly provided in sections 15-120g to 15-120o, inclusive, or by the board, every issue of bonds, notes or other obligations, shall be a general obligation of the authority payable out of any moneys or revenues of the authority subject only to any agreements with the holders of particular bonds, notes or other obligations pledging any particular moneys or revenues. Any such bonds, notes or other obligations may be additionally secured by any grant or contributions from any department, agency or instrumentality of the United States or person or a pledge of any moneys, income or revenues of the authority from any source whatsoever.

"(c) Any provision of any law to the contrary notwithstanding, any bonds, notes or other obligations issued by the authority pursuant to sections 15-120g to 15-120o, inclusive, shall be fully negotiable within the meaning and for all purposes of title 42a. Any such bonds, notes or other obligations shall be legal investments for all trust companies, banks, investment companies, savings banks, building and loan associations, executors, administrators, guardians, conservators, trustees and other fiduciaries and pension, profit-sharing and retirement funds.

"(d) Bonds, notes or other obligations of the authority shall be authorized by resolution of the board of directors of the authority and may be issued in one or more series and shall bear such date or dates, mature at such time or times, in the case of any such note, or any renewal thereof, not exceeding the term of years as the board shall determine from the date of the original issue of such notes, and, in the case of bonds, not exceeding thirty years from the date thereof, bear interest at such rate or rates, be in such denomination or denominations, be in such form, either coupon or registered, carry such conversion or registration privileges, have such rank or priority, be executed in such manner, be payable from such sources in such medium of payment at such place or places within or without this state, and be subject to such terms of redemption, with or without premium, as such resolution or resolutions may provide.

"(e) Bonds, notes or other obligations of the authority may be sold at public or private sale at such price or prices as the board shall determine.

"(f) Bonds, notes or other obligations of the authority may be refunded and renewed from time to time as may be determined by resolution of the board, provided any such refunding or renewal shall be in conformity with any rights of the holders thereof.

"(g) Bonds, notes or other obligations of the authority issued under the provisions of sections 15-120g to 15-120o, inclusive, shall not be deemed to constitute a debt or liability of the state or of any political subdivision thereof other than the authority or a pledge of the faith and credit of the state or of any such political subdivision other than the authority, and shall

court's . . . well reasoned memorandum of decision.

not constitute bonds or notes issued or guaranteed by the state within the meaning of section 3-21, but shall be payable solely from the funds herein provided therefor. All such bonds, notes or other obligations shall contain on the face thereof a statement to the effect that neither the state of Connecticut nor any political subdivision thereof other than the authority shall be obligated to pay the same or the interest thereof except from revenues or other funds of the authority and that neither the faith and credit nor the taxing power of the state of Connecticut or of any political subdivision thereof other than the authority is pledged to the payment of the principal of or the interest on such bonds, notes or other obligations.

"(h) Any resolution authorizing the issuance of bonds, notes or other obligations may contain provisions, except as expressly limited in sections 15-120g to 15-120o, inclusive, and except as otherwise limited by existing agreements with the holders of bonds, notes or other obligations, that shall be a part of the contract with the holders thereof, as to the following: (1) The pledging of all or any part of the moneys received by the authority to secure the payment of the principal of and interest on any bonds, notes or other obligations or of any issue thereof; (2) the pledging of all or part of the assets of the authority to secure the payment of the principal and interest on any bonds, notes or other obligations or of any issue thereof; (3) the establishment of reserves or sinking funds, the making of charges and fees to provide for the same, and the regulation and disposition thereof; (4) limitations on the purpose to which the proceeds of sale of bonds, notes or other obligations may be applied and pledging such proceeds to secure the payment of the bonds, notes or other obligations, or of any issues thereof; (5) limitations on the issuance of additional bonds, notes or other obligations; the terms upon which additional bonds, bond anticipation notes or other obligations may be issued and secured; the refunding or purchase of outstanding bonds, notes or other obligations of the authority; (6) the procedure, if any, by which the terms of any contract with the holders of any bonds, notes or other obligations of the authority may be amended or abrogated, the amount of bonds, notes or other obligations the holders of which must consent thereto, and the manner in which such consent may be given; (7) limitations on the amount of moneys to be expended by the authority for operating, administrative or other expenses of the authority; (8) the vesting in a trustee or trustees of such property, rights, powers and duties in trust as the authority may determine, which may include any or all of the rights, powers and duties of any trustee appointed by the holders of any bonds, notes or other obligations and limiting or abrogating the right of the holders of any bonds, notes or other obligations of the authority to appoint a trustee under this chapter or limiting the rights, powers and duties of such trustee; (9) provision for a trust agreement by and between the authority and a corporate trustee which may be any trust company or bank having the powers of a trust company within or without the state, which agreement may provide for the pledging or assigning of any assets or income from

assets to which or in which the authority has any rights or interest, and may further provide for such other rights and remedies exercisable by the trustee as may be proper for the protection of the holders of any bonds, notes or other obligations of the authority and not otherwise in violation of law. Such agreement may provide for the restriction of the rights of any individual holder of bonds, notes or other obligations of the authority. All expenses incurred in carrying out the provisions of such trust agreement may be treated as a part of the cost of operation of the authority. The trust agreement may contain any further provisions which are reasonable to delineate further the respective rights, duties, safeguards, responsibilities and liabilities of the authority; individual and collective holders of bonds, notes and other obligations of the authority and the trustees; (10) covenants to do or refrain from doing such acts and things as may be necessary or convenient or desirable in order to better secure any bonds, notes or other obligations of the authority, or which, in the discretion of the authority, will tend to make any bonds, notes or other obligations to be issued more marketable notwithstanding that such covenants, acts or things may not be enumerated herein; (11) any other matters of like or different character, which in any way affect the security or protection of the bonds, notes or other obligations.

"(i) Any pledge made by the authority of income, revenues, or other property shall be valid and binding from the time the pledge is made, and shall constitute a pledge within the meaning and for all purposes of title 42a. The income, revenue, or other property so pledged and thereafter received by the authority shall immediately be subject to the lien of such pledge without any physical delivery thereof or further act, and the lien of any such pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the authority, irrespective of whether such parties have notice thereof.

"(j) The board of directors of the authority is authorized and empowered to obtain from any department, agency or instrumentality of the United States any insurance or guarantee as to, or of or for the payment or repayment of, interest or principal, or both, or any part thereof, on any bonds, notes or other obligations issued by the authority pursuant to the provisions of sections 15-120g to 15-120o, inclusive, and, notwithstanding any other provisions of said sections, to enter into any agreement, contract or any other instrument whatsoever with respect to any such insurance or guarantee except to the extent that such action would in any way impair or interfere with the authority's ability to perform and fulfill the terms of any agreement made with the holders of the bonds, bond anticipation notes or other obligations of the authority.

"(k) Neither the members of the board of directors of the authority nor any person executing bonds, notes or other obligations of the authority issued pursuant to sections 15-120g to 15-120o, inclusive, shall be liable personally on such bonds, notes or other obligations or be subject to any

376 (2001)]. Because that memorandum of decision

personal liability or accountability by reason of the issuance thereof, nor shall any director or employee of the authority be personally liable for damage or injury, not wanton, reckless, wilful or malicious, caused in the performance of his duties and within the scope of his employment or appointment as such director, officer or employee. The authority shall protect, save harmless and indemnify its directors, officers or employees from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence or alleged deprivation of any person's civil rights or any other act or omission resulting in damage or injury, if the director, officer or employee is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless, wilful or malicious.

"(*l*) The board of directors of the authority shall have power to purchase bonds, notes or other obligations of the authority out of any funds available therefor. The authority may hold, cancel or resell such bonds, notes or other obligations subject to and in accordance with agreements with holders of its bonds, notes and other obligations.

"(m) All moneys received pursuant to the authority of sections 15-120g to 15-120o, inclusive, whether as proceeds from the sale of bonds or as revenues, shall be deemed to be trust funds to be held and applied solely as provided in said sections. Any officer with whom, or any bank or trust company with which, such moneys shall be deposited shall act as trustee of such moneys and shall hold and apply the same for the purposes of sections 15-120g to 15-120o, inclusive, subject to such regulations as said sections and the resolution authorizing the bonds of any issue or the trust agreement securing such bonds may provide.

"(n) Any holder of bonds, notes or other obligations issued under the provisions of sections 15-120g to 15-120o, inclusive, and the trustee or trustees under any trust agreement, except to the extent the rights herein given may be restricted by any resolution authorizing the issuance of, or any such trust agreement securing, such bonds, may, either at law or in equity, by suit, action, mandamus or other proceedings, protect and enforce any and all rights under the laws of the state or granted hereunder or under such resolution or trust agreement, and may enforce and compel the performance of all duties required by said sections or by such resolution or trust agreement to be performed by the authority or by any officer, employee or agent thereof, including the fixing, charging and collecting of the rates, rents, fees and charges herein authorized and required by the provisions of such resolution or trust agreement to be fixed, established and collected.

"(o) The authority may make representations and agreements for the benefit of the holders of any bonds, notes or other obligations of the state which are necessary or appropriate to ensure the exclusion from gross income for federal income tax purposes of interest on bonds, notes or other obligations of the state from taxation under the Internal Revenue Code of

fully addresses all arguments raised in this appeal, we

1986 or any subsequent corresponding internal revenue code of the United States, as from time to time amended, including agreement to pay rebates to the federal government of investment earnings derived from the investment of the proceeds of the bonds, notes or other obligations of the authority. Any such agreement may include: (1) A covenant to pay rebates to the federal government of investment earnings derived from the investment of the proceeds of the bonds, notes or other obligations of the authority, (2) a covenant that the authority will not limit or alter its rebate obligations until its obligations to the holders or owners of such bonds, notes or other obligations are finally met and discharged, and (3) provisions to (A) establish trust and other accounts which may be appropriate to carry out such representations and agreements, (B) retain fiscal agents as depositories for such fund and accounts and (C) provide that such fiscal agents may act as trustee of such funds and accounts."

General Statutes § 15-120m provides: "The exercise of the powers granted by sections 15-120g to 15-120o, inclusive, constitute the performance of an essential governmental function and the authority shall not be required to pay any taxes or assessments upon or in respect of the project, levied by any municipality or political subdivision or special district having taxing powers of the state and the project and the principal and interest of any bonds and notes issued under the provisions of said sections, their transfer and the income therefrom, including revenues derived from the sale thereof, shall at all times be free from taxation of every kind by the state of Connecticut or under its authority, except for estate or succession taxes."

General Statutes § 15-120n provides: "The state of Connecticut does hereby pledge to and agree with the holders of any bonds or notes issued under sections 15-120g to 15-120o, inclusive, or with those parties who may enter into contracts with the authority, pursuant to said sections, that the state shall not limit or alter the rights hereby vested in the authority until such obligations, together with the interest thereon, are fully met and discharged, and such contracts are fully performed on the part of the authority, provided nothing contained herein shall preclude such limitation or alteration if and when adequate provision shall be made by law for the protection of the holders of such bonds, notes and other obligations of the authority or those entering into contracts with the authority. The authority is authorized to include this pledge and undertaking for the state in such bonds, notes and other obligations or contracts."

General Statutes § 15-120o provides: "(a) Within the first ninety days of each fiscal year of the authority, the board of directors of the authority shall submit a report to the Governor, the Auditors of Public Accounts and the joint standing committee of the General Assembly having cognizance of matters relating to finance, revenue and bonding. Such report shall include, but not be limited to, the following: (1) A list of all bonds issued during the preceding fiscal year, including, for each such issue, the financial advisor and underwriters, whether the issue was competitive, negotiated

adopt it as a proper statement of the issues and the applicable law concerning those issues. It would serve no useful purpose for us to repeat the discussion contained therein." (Citation omitted.) *Davis* v. *Freedom of Information Commission*, 259 Conn. 45, 55–56, 787 A.2d 530 (2002).

The judgment is affirmed.

---

or privately placed, and the issue's face value and net proceeds; (2) a description of the project, its location, and the amount of funds, if any, provided by the authority with respect to the construction of the project; (3) a list of all outside individuals and firms receiving in excess of five thousand dollars in the form of loans, grants or payments for services; (4) a comprehensive annual financial report prepared in accordance with generally accepted accounting principles for governmental enterprises; (5) the cumulative value of all bonds issued, the value of outstanding bonds, and the amount of the state's contingent liability; (6) the affirmative action policy statement, a description of the composition of the work force of the authority by race, sex and occupation and a description of the affirmative action efforts of the authority; and (7) a description of planned activities for the current fiscal year.

"(b) The board of directors of the authority shall annually contract with a person, firm or corporation for a compliance audit of the authority's activities during the preceding authority fiscal year. The audit shall determine whether the authority has complied with its regulations concerning affirmative action, personnel practices, the purchase of goods and services and the use of surplus funds. The board shall submit the audit report to the Governor, the Auditors of Public Accounts and the joint standing committee of the General Assembly having cognizance of matters relating to finance, revenue and bonding.

"(c) The board of directors of the authority shall annually contract with a firm of certified public accountants to undertake an independent financial audit of the authority in accordance with generally accepted auditing standards. The board shall submit the audit report to the Governor, the Auditors of Public Accounts and the joint standing committee of the General Assembly having cognizance of matters relating to finance, revenue and bonding. The books and accounts of the authority shall be subject to annual audits by the state Auditors of Public Accounts."